No. 85-468

IN THE SUPREME COURT OF THE STATE OF MONTANA

1986

_____

ESTHER McDONALD, JOHN McDONALD, JR., and
EUGENE MANLEY, individually as representatives
of the GRANITE COUNTY WATER USERS ASSOCIATION,
et al.,

        Petitioners,

    -vs-

THE STATE OF MONTANA, and the WATER COURTS
OF THE STATE OF MONTANA,

        Respondents.

_____

ORIGINAL PROCEEDING:

COUNSEL OF RECORD:

    For Petitioners:

        Josephson & Fredricks; Richard Josephson argued,
        Big Timber, Montana

    For Respondents:

        Hon. W.W. Lessley argued, Chief Water Judge, Bozeman,
        Montana
        Hon. Mike Greely, Attorney General, Helena, Montana
        Clay Smith, Asst. Atty. General, Helena, Montana
        Ed Steinmetz, Water Master, Bozeman, Montana

_____

Submitted: February 21, 1986

Decided: April 8, 1986

Filed: APR 8 - 1986

_Ethel M. Harrison_

Clerk

Mr. Justice John C. Sheehy delivered the Opinion of the Court.

We determine here that the provisions of § 85-2-234, MCA, applicable to final decrees issued by the Water Courts (and also applicable to preliminary decrees under § 85-2-231, MCA), requiring the final decree to state "the amount of water, rate and volume included in the [water] right" are not unconstitutional as to direct flow irrigation water rights that have not heretofore been historically decreed or defined in terms of volume.

Esther McDonald and the other parties named as petitioners in the above caption brought this original action in the Montana Supreme Court by filing their complaint for declaratory judgment. Before deciding to accept jurisdiction of the cause, we asked for responses from the Water Courts and from the State of Montana, the named respondents. We consolidated with this cause for purpose of responses cause no. 85-345, entitled Montana Department of Fish, Wildlife & Parks, petitioner vs. Water Court of the State of Montana and the Judges of that Court, respondents, and cause no. 85-493, United States of America, petitioner vs. Water Court of the State of Montana and the Judges of that Court, respondents. After receiving responses, we set oral argument for the respective causes as consolidated for February 21, 1986. On that date, counsel for the various parties appeared, and presented a stipulation that had been entered into by the parties for the purpose of resolving the several issues raised.

In the stipulation of the parties presented on February 21, 1986, it is stated:

- 2 -

12. Count I of the McDonald complaint requests the Montana Supreme Court declare unconstitutional the requirements of Title 85, Chapter 2, Part 2, MCA, requiring quantification of water rights by volume, as violating the recognition and confirmation of such water rights as they existed on the effective date of Art. IX, Section 3 of the 1972 Constitution of Montana.

13. To the extent that no controverted issues of fact are involved, the parties agree the constitutionality of Title 85, Chapter 2, Part 2, MCA, and specifically Section 85-2-234(5)(b), MCA, which requires the decreeing of volume for pre-July 1, 1973 direct flow irrigation water rights that have not been historically decreed or defined in terms of volume, should be expeditiously decided by the Montana Supreme Court as the issue is pending in Cause No. 85-468.

The constitutional issue presented is framed on the allegation contained in count 1(c), paragraph XI, of the McDonald complaint that the

. . . water courts have been and are continuing to adjudicate existing water rights on the basis of volume, limiting such rights to a certain volume, expressed in acre-feet per acre per year.

The 1972 Constitution, Art. IX, § 3 provides:

Water Rights. (1) All existing rights of the use of any waters for any useful or beneficial purpose are hereby recognized and confirmed.

. . .

(4) The legislature shall provide for the administration, control and regulation of water rights and shall establish a system of centralized records, in addition to the present system of local records.

McDonald has attached to her complaint in this Court as Exhibit A, random copies of typical decrees made by district courts prior to July 1, 1973. In each of the decrees, the water rights there protected are expressed in terms of flow rate and not in terms of volume.

The statutory provision for the measurement of water is found in § 85-2-103, MCA. It states:

Measurement of water. (1) After July 1, 1899, a cubic foot of water (7.48 gallons) per second of

time shall be the legal standard for the measurement of water in this state.

(2) Where water rights expressed in statutory or miner's inches have been granted, 100 statutory or miner's inches shall be considered equivalent to a flow of 2.5 cubic feet (18.7 gallons) per second, 200 statutory or miner's inches shall be considered equivalent to a flow of 5 cubic feet (37.4 gallons) per second, and this proportion shall be observed in determining the equivalent flow represented by any number of statutory or miner's inches.

(3) The provisions of this section shall not affect or change the measurement of water decreed by a court prior to July 1, 1899, but such decreed water shall be measured according to the law in force at the time such decree was made and entered.

McDonald and her copetitioners allege and argue that their respective water rights have never been expressed in terms of volume, but rather in terms of flow rate (miner's inches or cubic feet per second) limited only by the acres respectively irrigated. They contend that "any attempt to define volume in the decrees listing pre-July 1, 1973 water rights is speculative, places an added burden on pre-July 1, 1973 rights and violates Article IX, Section 3, of the 1972 Montana Constitution and Section 85-2-103, providing that the flow rate is the 'legal standard' for measurement."

McDonald and her copetitioners have standing to sue. They are the owners of water rights in areas for which temporary preliminary decrees have been issued by the Water Courts, to-wit the Flint Creek drainage area in Granite and Deer Lodge Counties, the Boulder River Basin area in Sweet Grass and Park Counties, the Sweet Grass Creek drainage area in Park, Stillwater and Sweet Grass Counties and the Bridger Creek drainage area in Gallatin, Park, Sweet Grass and Stillwater Counties. As to temporary preliminary decrees which have been entered for those basins, the petitioners

have entered their objections to the determination of their and other rights in terms of volume.

The issue raised is not limited personally to McDonald and her copetitioners, but extends throughout the whole process of the adjudication of irrigation water rights by the Water Courts. The issue affects all of those rights. Adjudication by this Court now as to the issue raised would serve to guide the Water Court in this particularly important matter; would provide judicial economy in avoiding protracted litigation both in the Water Courts and in this Court; and would serve the public policy of the state by expediting the determination of existing water rights. It is therefore appropriate that we accept jurisdiction of this issue by way of declaratory relief, involved as it is with our duty to supervise the Water Courts. We have, moreover, a justiciable issue which does not require further determinations of factual issues either by a master or by a district court. Section 27-8-201, MCA (power to declare rights); Rule 17(a), M.R.App.Civ.P.; § 3-7-204, MCA; State ex rel. Judge v. Legislative Finance Committee (1975), 168 Mont. 470, 543 P.2d 1317; City of Billings v. Smith (1971), 158 Mont. 197, 490 P.2d 221; State ex rel. Schultz-Lindsay v. Board of Equalization (1965), 145 Mont. 380, 403 P.2d 635.

McDonald and her copetitioners have raised other issues in their complaint relating to procedures and actions taken in the Water Courts to which they have made objection, but we do not direct our attention to those issues at this time.

Through Art. IX, § 3(3), 1972 Mont. Const., the people of this state declared that all waters within the state are the property of the state for the use of its people and are subject to appropriation for beneficial uses as provided by

law. The people, through the constitution, impressed on the legislature the duty of establishing a system of centralized records in addition to the present system of local records for the administration, control and regulation of water rights. Art. IX, § 3(4), 1972 Mont. Const.

In order for the state to establish a system of centralized records, the legislature established the Water Courts (Title 3, Ch. 7, MCA) and provided for the adjudication of water rights (Ch. 697, Laws of Montana (1979), now §§ 85-2-211, -243, incl., MCA). In essence the legislature turned to the courts for such adjudication.

No more difficult task has ever been assigned by the legislature to the court system of this state. As Chief Water Judge W. W. Lessley pointed out in oral argument herein, only the courts could provide the mechanism by which existing water rights could be determined, recorded and protected with full constitutional guaranties.

There are two components to the Montana Constitutional guaranty: there must be an existing right to the use of water, and the use must be for a beneficial purpose. Art. IX, § 3(1), 1972 Mont. Const.

We can accept as true the contention of McDonald and her copetitioners that practically every irrigation water right prior to July 1, 1973 was expressed in flow rate, expressed in miner's inches or cubic feet per second and related directly or indirectly to the number of acres being irrigated. We can also accept as true their contention that the volume of water used by irrigators up to or within the limit of their appropriation rights would vary greatly from year to year depending upon circumstances not within the control of the irrigators, such as climatic conditions from

- 6 -

year to year, subsoil types, lengths of the ditches, porosity, permeability, dry years, wet years and so on. It is natural therefore that irrigators would fear that the expression of a volume amount in acre feet as a limit of their right would adversely affect their flow rights to the use of water under certain conditions.

Yet Montana has always protected, by law and the decisions of this Court prior to 1972, and by the Montana Constitution since 1972, any beneficial irrigation right within the original appropriation of water. It is quite apparent from all the pre-1973 water cases in Montana that the courts look to beneficial use as the essential criterion in determining suits between water claimants.

In Tucker v. Missoula Light & Water Co. (1926), 77 Mont. 91, 250 P. 11, Tucker was entitled to 377 miner's inches out of Rattlesnake Creek, north of Missoula, and the Missoula Light & Water Co., which supplied water to the City of Missoula, had total rights to 2,676 miner's inches. However, only 1,119.5 inches of the Missoula right preceded the fifth decreed right which provided Tucker with 45 inches jointly with Missoula's 115 inches.

In 1924, Missoula Light took 1,344 inches of the water out of Rattlesnake Creek through a flume and then passed it through a pipeline which had but 1,144.8 inches of capacity. Missoula Light returned 199.2 inches to the creek through a spillway away from Tucker. He testified that if he had received only 40 or 50 miner's inches, it would have been sufficient to protect his crops for the years involved. In passing on the case and granting damages to Tucker against Missoula Light, this Court noted:

> The so-called "ownership of water" differs from
> that of personal property capable of corporeal
> possession. Neither the appropriator of water nor
> one to whom a right is decreed owns the corpus of
> any part of the flow of the stream. He is entitled
> to only the beneficial use of the amount of water
> called for by his appropriation or decree when he
> has need therefor, and providing his distributing
> system has a sufficient capacity to carry such an
> amount of water. (Citing a case.) When his
> ditches are incapable of carrying the amount of
> water decreed to him, his right is measured by the
> capacity of a system of distribution, regardless of
> his needs. (Citing cases and statutes.) So long
> as a party has all the water his necessity requires
> or that his ditches will carry, it is immaterial
> that he has a right, under decree or otherwise, to
> a greater flow from the creek. It is his duty to
> permit the excess to remain in the creek or, having
> diverted it, to return it to the creek in such
> manner that it will be available to subsequent
> appropriators of decreed rights. (Citing cases.)
> (Emphasis added.)

77 Mont. at 101-2, 250 P.2d at 15.

Another illustrative case is Quigley v. McIntosh (1930), 88 Mont. 103, 290 P. 266. Quigley was granted by the District Court 800 miner's inches of water out of Ophir Creek in Powell County, but his right was junior to earlier appropriations totaling 1,650 inches. Three of the earlier appropriations, however, were appropriated for placer mining purposes, totaling 650 inches. Quigley alleged that the flow in Ophir Creek was more than sufficient to satisfy all the rights recognized and that during the months of May and June until about July 15, the flow of water in the creek actually exceeded the needs of all the prior appropriators as adjudicated. He had sought to divert 1,000 inches as an additional water right subject to the prior appropriations.

The District Court granted Quigley 800 inches of his claimed 1,000 inches but held that Quigley could not take the waters from the creek when the volume of water flowing therein was equal to or less than 1,650 miner's inches. Quigley appealed the latter part of the judgment. The

Supreme Court agreed that the District Court had erred. Since the prior placer appropriations of 650 inches might not be used, that amount of water in the stream was available for appropriation by Quigley, and it was error for the District Court to restrict his right of appropriation to a time when more than 1,650 inches of water were in the stream because the policy of the state was to avoid waste of waters:

> We have also said repeatedly that it is to the interest of the public that water be conserved for use, rather than be permitted to go to waste, to the end that the arid lands of the state may be put under irrigation and thus be made productive. (Citing cases.) . . . when [a] new water right is allowed it is governed by all of the provisions of the decree [in a decreed stream] just as if the appropriator had been a party to the original decree. He has the right to use the waters of the stream and in the order of his juniority.
>
> . . . As illustrative: It appears that three of the early rights, aggregating 650 inches, are confined exclusively to placer mining purposes. There may be years when no placer mining whatever is being done by the use of the waters of Ophir Creek. In the process of time when the placer mines no longer yield up their auriferous treasures, there will not be any use for these water rights. When the same are not required for use of placer mining, the waters must be allowed to flow in the stream, subject to capture by other users upon the stream in the order of their priority.

Id. at 107-9, 290 P. at 268-69.

Anderson v. Cook (1901), 25 Mont. 330, 64 P. 873, presents a different facet. It is authority that a large number of miner's inches might be necessary to provide a head of water sufficient to overcome seepage and leakage along the way to the farmlands. In this case, the parties owned a diversion ditch in common, out of which each took laterals to perform their irrigation. However, Cook placed his "boards" so as to totally inundate his lands, and in effect to waste the water. The Court said this in holding for Anderson:

> The parties did not own the water. They had a right to the use of it in common. They did not have a prior right. The defendants assume that they were at all times entitled to take out two-thirds of the water, provided they left one-third thereof in quantity in the main ditch. This is error. If there were 1,200 inches in the ditch, and they needed and took out 800 inches at a point 100 feet below the reservoir, there would be left 400 inches, one-third of the volume of water, with a journey of more than one mile to go in warm weather, and over a slow grade, and through a ditch from 144 inches to 228 inches wide, subject to very great loss from seepage, evaporation and actual leakage. The slightest knowledge of the laws of nature will convince any reasonable person that the plaintiff would get a very small part of the 400 inches wherewith to make his desert lands produce remunerative crops.

25 Mont. at 338-9, 64 P. 876.

In the Anderson case, the District Court cured the problem by requiring that the defendants allow Anderson to take water out of the main diversion ditch exclusively two days of the week in order to get enough water to his place to cultivate his crops.

In Conrow v. Huffine, et al. (1914), 48 Mont. 437, 138 P. 1094, Huffine and others, having prior rights to 90 miner's inches, took all of the waters out of Bear Creek, east of Bozeman, to irrigate approximately 70 acres. There were never more than 100 inches flowing in the creek during the irrigating season. Conrow had junior rights and sued on the ground that allowing Huffine to take all of the water that had been appropriated by him resulted in waste, and deprived the junior appropriator of any irrigation water. The District Court determined that Huffine and others had never irrigated more than 70 acres and said:

> While we have no legislation on the subject, the rule has generally been observed by the courts in this state, in fixing the amount required for economical use, to allow one inch per acre, unless the evidence discloses that a greater or less amount is required. All the witnesses who testified on the subject agreed that fifty or sixty

inches furnished a sufficient head for effective
working purposes [for Huffine] . . .

Id. at 445-46, 138 P. at 1096-97.

An important element to determine the extent of a water

right is the capacity of the ditch made by the first

appropriator. Thus it was stated in Conrow:

> The test of the extent of an appropriation with
> reference to a subsequent right to the waters of a
> stream is dependent upon the capacity of the first
> ditch before such subsequent appropriation is made.
> When an owner or possessor of land makes an
> appropriation of water in excess of the needs of
> the particular portion of the land upon which he
> conveys the water, and other portions of his land
> also require irrigation, his water right is not
> limited by the requirements of the particular
> fraction. He may still, despite the fact that
> another's water right has attached, construct other
> ditches through his remaining land, provided that
> the total amount of water conveyed by all the
> ditches on his place does not exceed the original
> capacity of the first ditch. As between his
> appropriation and the subsequent water right, the
> capacity of the ditch, by means of which he first
> made his appropriation is the test of the extent of
> it. (Citing a case.) Under this rule, the extent
> of the right of the first appropriator is measured
> by the capacity of the original ditch. After the
> use has been installed, however, if the capacity of
> the ditch exceeds the amount required for
> reasonable use, the necessity for the use and not
> the size of the ditch, is the measure of the extent
> of the right (citing cases). The tendency of
> recent decisions of the courts in the arid states
> is to disregard entirely the capacity of the ditch
> and regard the actual beneficial use, installed
> within a reasonable time after the appropriation
> has been made, as the test of the extent of the
> right.

48 Mont. at 443-44, 138 P.2d 1096.

The foregoing cases and many others serve to illustrate

that what is preserved to owners of appropriated or decreed

water rights by the provision of the 1972 Constitution is

what the law has always contemplated in this state as the

extent of a water right:  such amount of water as, by pattern

of use and means of use, the owners or their predecessors put

to beneficial use. Thus an owner may have a decreed right to

a certain number of miner's inches of water; or a statutory appropriative right to a stated amount; or a right depending upon mere use; or even a prescriptive right to a stated amount; nonetheless, the Water Use Act contemplates that all water rights, regardless of prior statements or claims as to amount, must nevertheless, to be recognized, pass the test of historical, unabandoned beneficial use. (Abandonment, of course, is a separate fact issue to be determined if necessary by the water court.) To that extent only the 1972 constitutional recognition of water rights is effective and will be sustained.

We come then to the requirement by the legislature of the inclusion in the decrees as to each existing water right "the amount of water, rate and volume included in the right." Section 85-2-234(5), MCA. It is apparent to us that the legislature, cognizant as it was of the duties imposed upon it by the Montana Constitution, and of the confirmation and recognition in the Constitution of existing water rights, did not intend by the inclusion of the "volume" requirement as to water irrigators to place an additional burden upon their water rights.

On the other hand, the quantification of the total water rights in the State of Montana is an expressed and necessary objective under the Constitutional mandate for centralized records and is within the police power of the state. Tulare Irr. Dist. v. Lindsay-Strathmore Irr. Dist. (Cal. 1935), 45 P.2d 972, 988. Especially quantification is necessary so that the total amount of water necessary for beneficial uses may be considered in determining other inflow stream rights, and reserved rights, if any.

Always to be borne in mind is that no matter how the water right is expressed in the decrees of the water court, either in flow rate or in acre feet or a combination thereof, such expression of amount is not the final determining factor. It is best expressed in the statutes of other states: beneficial use shall be the basis, the measure and the limit of all rights to the use of water. See for example, § 73-1-3, Utah Codes Annot.

We are guided in this matter by the decision of the California Supreme Court in Tulare Irr. Dist. v. Lindsay-Strathmore Irr. Dist., supra, a case involving a dispute between riparian owners and appropriators. The Superior Court had before it water rights based on flow rate, which if taken under continuous flow would far exceed the available amount of water in the stream. The Court pointed out that junior appropriators have a material interest in having the ultimate quantity to be received by those who have prior claims fixed with reasonable certainty and for that reason determined that the awards of rights should be fixed in cubic feet per second, with a maximum limitation in acre-feet "measured, of course, by the maximum number of acre-feet used by each appropriator in the past." 45 P.2d at 997.

In oral argument, counsel for McDonald contended that if an appropriator who formerly used flood irrigation switched to sprinkler irrigation, the appropriator would be using less water than his original appropriation allowed him. If, by reason of excessive utility rates or otherwise, the appropriator decided to return to flood irrigation, and to abandon the sprinkling, he would be deprived under an acre-feet decree of a water right guaranteed to him by the

- 13 -

Constitution. In our view, such an appropriator would be in no different position than an appropriator, who in wet years, though entitled to 400 miner's inches of water for 60 days, used only 200 inches for 30 days. There is no doubt that he would have the right to return in dry years to the full extent of his appropriation provided he was putting the water to a beneficial use.

It was also contended by others on oral argument that in dry periods such as Montana has been experiencing in recent years, the subsoil moisture disappears, and a greater volume of water is necessary to replace the subsoil moisture and to provide remunerative crops for which an acre-feet award might be short. In that case the acre-feet volume expressed in his water right decreed by the Water Court would give way to his right to an appropriation of such flow-rate of water as would be necessary to provide the beneficial use to which the appropriator was historically entitled.

The rule which will serve to guide the courts and appropriators before and after the decrees of the Water Courts is again expressed in Tulare, supra:

> An appropriator, as against subsequent appropriators, is entitled to the continued flow to the head of his ditch of the amount of water that he, in the past, whenever that quantity was present, has diverted for beneficial purposes, plus a reasonable conveyance loss, subject to the limitation that the amount be not more than is reasonably necessary, under reasonable methods of diversion, to supply the area of land theretofore served by his ditch. The appropriator is limited to reasonable beneficial uses. A reading of the many cases on the law of appropriation indicates a gradual and consistent tightening of the rule measuring the rights of appropriators. The early cases measured the appropriator's right by the capacity of his ditch, but that rule has long since been repudiated in this state. Smith v. Hawkins, 120 Cal. 86, 52 P. 139. As the pressure of population has led to the attempt to bring under cultivation more and more lands, and as the demands for water to irrigate these lands have become more

and more pressing, the decisions have become increasingly emphatic in limiting the appropriator to the quantity reasonably necessary for beneficial uses. (Citing cases.) If the appropriator uses more than the amount so required, he gains no right thereto. An excessive diversion of water for any purpose cannot be regarded as a diversion for a beneficial use. Insofar as the diversion exceeds the amount reasonably necessary for beneficial purposes, it is contrary to the policy of the law and is a taking without right and confers no title, no matter for how long continued. (Citing cases.) In determining what is a reasonable quantity for beneficial uses, it is the policy of the state to require within reasonable limits the highest and greatest duty from the waters of the state.. . .

45 P.2d at 997.

The case before us illustrates the wisdom of the legislature in providing for preliminary decrees. Section 85-2-231, MCA. By the use of a preliminary decree, the Water Court, over a period of one or more seasons may test the provisions of its decree to determine that it works fairly and properly as between appropriators and between appropriators and those with other interests. Such other modifications as may be necessary can be made before the entry of the final decree.

We hold therefore that the Water Courts in rendering a preliminary decree under § 85-2-231, MCA, or a final decree under § 85-2-234, MCA, must as to each pre-1973 irrigation water right state the amount of water, rate and volume included in the right; but that the amount, rate and volume must at all times be subject to the requirement of beneficial use. Thus if in a rare case a beneficial use under a pre-1973 water irrigation right required a greater amount of water than the acre feet fixed in the decree, and such beneficial use was within the pre-1973 flow-rate appropriation as to the pattern of use and means of use, the amount required by beneficial use would control, though it

- 15 -

exceeded the acre feet fixed in the decree. In like manner, if the beneficial use required a lesser amount than the acre feet fixed therein, the appropriator holds no title or right to the excess volume of water over and above the requirements of his beneficial use.

All must recognize that we live in a state with great fluctuation and uncertainty in the amount of water available. It will become a hazard of living under the judgments of the Water Courts that the parties determine their rights to the flow as it exists. Where volumes cannot be made more definite, as they are contained in judgments, we will repair, as always, to the concept of beneficial use in determining rights subject, of course, to the priorities established by law.

In so holding, we place no added burden on the owners of pre-July 1, 1973 irrigation water rights, nor do we offend the provisions of Art. IX, § 3(1), of the 1972 Montana Constitution. Flow rate contained in Water Court decrees must still be expressed in cubic feet per second, as they had earlier been expressed, and in the long run the amount actually needed for beneficial use within the appropriation will be the basis, the measure and the limit of all water rights in Montana as between appropriators, and as between appropriators and others.

_____
                Justice

We Concur:

_____
        Chief Justice

- 16 -

_John Conway Harrison_

_[signature]_

_[signature]_

_[signature]_
Justices

_[signature]_
Hon. Leonard Langen,
District Judge, Sitting
for Mr. Justice Frank B.
Morrison, Jr.