No. 88-093

IN THE SUPREME COURT OF THE STATE OF MONTANA

1988

---

IN THE MATTER OF THE ADJUDICATION OF THE
EXISTING RIGHTS TO THE USE OF ALL THE WATER
BOTH SURFACE AND UNDERGROUND, WITHIN THE
DEARBORN DRAINAGE AREA, INCLUDING ALL
TRIBUTARIES OF THE DEARBORN RIVER IN CASCADE
AND LEWIS AND CLARK COUNTIES, MONTANA.

---

APPEAL FROM:  The Water Courts of the State of Montana
             The Honorable Roy Rodeghiero, Judge presiding.

COUNSEL OF RECORD:
     For Appellant:
          Robert N. Lane argued, Helena, Montana

     For Respondent:
          Moore, Rice, O'Connell & Refling; Perry J Moore argued,
          Bozeman, Montana
          David C. Moon and Dorothy L. Brownlow, Bozeman, MT
          James D. Rector, Glasgow, Montana
          W. G. Gilbert, Jr.,' Dillon, Montana
          James J. Bottomly, Bozeman, Montana
          William R. Morse, Absarokee, Montana
          John M. Dietrich, Billings, Montana
          John C. Doubek, Helena, Montana
          Lisa Leckie, Helena, Montana
          Chris Mangen, Jr., Billings, Montana

     For Amicus Curiae:
          Montana Wildlife Federation and Trout Unlimited
          Stan Bradshaw, Helena, Montana
          Thomas M. France, Missoula, Montana

---

Submitted:  September 9, 1988

Decided:  October 19, 1988

FILED
'88 OCT 19 AM 8 53
Filed:
CLERK
MONTANA SUPREME COURT

_Ethel M. Harrison_

Clerk

Mr. Justice John C. Sheehy delivered the Opinion of the Court.

We hold here that the Water Court was correct in determining on August 27, 1987, that the Department of Fish, Wildlife and Parks (DFWP) does not have a valid pre-1973 appropriation water right claim to the in-lake or in-stream waters of Bean Lake, situated in the Dearborn River Drainage area.

Bean Lake is a natural pothole lake, lying across the four common corners of Sections 13 and 14, Township 18 North, Range 7 West, and Sections 18 and 19, Township 18 North, Range 6 West, M.P.M. There is no defined water inlet to Bean Lake. Its sources are ground water seepage and run-off from precipitation. The lake has a surface area of about 200 acres, a maximum depth of 31 feet and a total average volume of 2,862 acre-feet. Though the lake has a man-made overflow emptying to the north fork of the Dearborn River, no water flows out of the lake under normal circumstances.

The Dearborn River Drainage area, which includes Bean Lake, is subject to the ongoing statewide adjudication of water rights commanded under Title 85, Ch. 2, Part 2 (§§ 85-2-201-243), MCA (1987). Acting under §§ 85-2-221, 223, 224, MCA, DFWP duly filed a claim for a use water right based on recreation to "all the water stored in [Bean] Lake." The Dearborn River Basin is designated by the Water Court as Basin 41U, and the claim of DFWP was assigned the claim number 41U-W-96936. DFWP claims a "use" right under the Montana prior appropriation doctrine. Its claim is not based in any manner on the public trust doctrine. The claimed use was "recreation," but the claim was amended at trial before

the Water Court to include use for "fish and wildlife" purposes.

DFWP first planted fish in Bean Lake on May 27, 1933. Rainbow trout were planted in 1934, silver salmon in 1935, and then not again until 1951 when fish were planted every year thereafter.

Prior to 1951, privately owned lands completely surrounded Bean Lake, with no public access. On May 15, 1951, Wallace Bean, the owner of lands abutting Bean Lake, entered into a tripartite agreement with the then Montana State Fish and Game Department, and the Augusta Chamber of Commerce, whereby Bean permitted access over his lands to the water's edge for the public to use in boating and fishing on Bean Lake. In return, the Montana Fish and Game Department instigated a management plan and agreed to stock the lake with suitable fish. The Augusta Chamber of Commerce agreed to set up conveniences for visitors and in effect to police the area. The agreement provided that either party could terminate the agreement after two years, in which case the lake would revert "back to its original management as a privately owned lake."

In 1964, Wallace R. Bean and Fern L. Bean, his wife, by warranty deed, conveyed to the State Fish and Game Commission (a predecessor of DFWP) 16.33 acres abutting Bean Lake. Under the deed, the grantors had the right to drain and lower the level of Bean Lake to a point on a permanent marker installed at the lake's edge. The Beans covenanted, to run with the land, that the lake would at all times be maintained at a level equal to or higher than the permanent marker.

In 1963, at about the same time as the warranty deed transaction, the Beans filed a water right claim on Bean Lake for irrigation purposes. At least one other appropriator has

an earlier appropriation water claim to Bean Lake for stock water.

It is assumed by the Court that there has been extensive public use of Bean Lake for recreational and fishing purposes through the years herein mentioned, and yearly efforts by DFWP and its predecessors to manage the fisheries resource, compute Bean Lake surface levels, make studies regarding animal wastes in Bean Lake, enforce rules regarding use of motorboats, and other indicia of DFWP involvement regarding the lake.

In the adjudication of the Dearborn River drainage area by the Water Court, a temporary preliminary decree was entered which omitted the claim of DFWP to an appropriative use right in the waters of Bean Lake. The remark of the Water Court in denying the DFWP claim was that the "Water Court finds no legal basis for this purpose to be considered as a beneficial use or appropriation of water."

DFWP filed an objection to the Water Court's denial of its claim in adopting the temporary preliminary decree, and eventually the objection came on for a pre-hearing conference. The legal issues in the case were of a precedent-setting nature which required statewide notice by publication. The notice invited and provided for participation by interested persons in the legal issues presented and allowed the equivalent of objections to the potential quantity of DFWP's claimed right. Those who desired to participate were required to file a Notice of Intent to Appear. Over 50 different individuals or groups exercised an option to participate. DFWP's claim came on for trial before the Water Court. On August 27, 1987, the Water Court entered its findings of fact, conclusions, judgment and decree to the effect that the claim of DFWP was not a valid appropriation water right "because of the lack of diversion,

intent, and notice." The claim of DFWP was therefore terminated. Appeal by DFWP to this Court followed.

The first problem is whether the decision of the Water Court is appealable to this Court at this stage of the proceedings. No Rule 54(b) certificate was sought or procured from the Water Court.

In the recent consolidated causes no. 87-528 (relating to the Sage Creek Drainage area) and 88-092 (relating to the Boulder River Drainage area) decided October 11, 1988, we dismissed appeals where a Rule 54(b) certificate had not been obtained, in effect holding that the causes were not final for the purposes of appeal. We have decided not to take that course with respect to this case. We are informed that DFWP has filed 15 to 17 claims in various drainages which claim a water right based on the doctrine of appropriation, based on facts similar to those here. DFWP is given authority exclusively to represent the public for purposes of establishing any prior and existing public recreational use right in the ongoing water right determinations. Section 85-2-223, MCA. Under this statute, DFWP considers itself duty-bound to file appropriative use claims in this and other drainages. The issue, of course, will recur, and any decision by us now as to the precise validity of such appropriation claims would help speed the water adjudication process. As we said in McDonald v. State (Mont. 1986), 722 P.2d 598, 43 St.Rep. 576:

> The issue raised is not limited personally to McDonald and her co-petitioners, but extends throughout the whole process of the adjudication of irrigation of water rights by the Water Courts. The issue affects all of those rights. Adjudication by this Court now as to the issue raised would serve to guide the Water Court in this particularly important matter; would provide judicial economy in avoiding protracted litigation both in the Water Courts and in this Court; and

- 5 -

would serve the public policy of the state by expediting the determination of existing water rights. It is therefore appropriate that we accept jurisdiction of this issue by way of declaratory relief, involved as it is with our duty to supervise the Water Courts. We have, moreover, a justiciable issue which does not require further determinations of factual issues either by a master or by a district court. (Citing authority.) . . .

722 P.2d at 601, 43 St.Rep. at 579.

The parties to this lawsuit are anxious for an early determination of the issues presented, and each urges us to take jurisdiction of the appeal. We could accept jurisdiction under our power to declare rights, status and other legal relations, whether or not further relief is or could be claimed (§ 27-8-201, MCA) and to afford relief on certainty and insecurity with respect to those rights (§ 27-8-102, MCA). Lest there be any dispute about it, however, we accept jurisdiction of this cause under our power of general supervisory control over the Water Courts. Art. VII, § 2(2), 1972 Mont. Const.

The second issue to be disposed of is the contention of DFWP that the Montana Stockgrowers Association has no standing as a party in this cause. DFWP contends that the Association represents no person who had a potential to be adversely affected by the DFWP claim in Bean Lake. The DFWP objected before the Water Court claiming that because there were only two other potential appropriation users in the Bean Lake adjudication, and since the Association did not represent either of them individually in a cause, no justiciable controversy or standing in the Association existed.

The Montana Stockgrowers Association answers that the importance of the issue was recognized by the Water Court which required statewide notice to be given and invitation

for others to appear. Because of the large numbers of persons appearing, the law firm of Moore, Rice, O'Connell and Refling was appointed lead counsel for all those appearing to oppose the claim, including their client Montana Stockgrowers Association. The Association further claimed standing on behalf of its membership who could be affected. It appears that both of the appropriators in Bean Lake are also members of the Association. We agree that Stockgrowers must be able to show an interest in the subject matter of litigation which has been injuriously affected by the judgment or order to have standing on appeal. Holmstrom Land Company v. Newland Creek Water District (1979), 185 Mont. 409, 425, 605 P.2d 1060, 1069.

In the very recent case of New York State Club Ass'n., Inc. v. City of New York, et al. (Decided June 20, 1988, no. 86-1836), ___ U.S. ___, ____ S.Ct. _____, ____ L.Ed.2d ___, the United States unanimously upheld the right of an association to proceed in an action on behalf of its members. The Supreme Court held an association has standing to sue on behalf of its members when "(a) its members would otherwise have standing to sue in their own right, (b) the interests it seeks to protect are germane to the organization's purpose; and (c) neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit." Those conditions for standing are all met here. We hold that the tests in New York State Club Ass'n., Inc., supra, also determine the standing of an association to appear as a party on behalf of its members in the state courts of Montana. In this cause, the Montana Stockgrowers Association has standing as a party.

We turn now to the principal issue in this case, which is whether DFWP, for itself or for the people, has an enforceable appropriation water right claim for recreation,

- 7 -

fish and wildlife purposes in Bean Lake that pre-existed 1973. The DFWP claim is based exclusively on the doctrine of appropriation, and we can concentrate our discussion on the attributes of that doctrine in making a decision.

What would be the effect if we agreed with DFWP that an appropriation right existed? DFWP argues for a priority date of 1951, the time that its predecessor entered into a tripartite agreement with the Beans and the Augusta Chamber of Commerce. Its claim is for the use of all the water "stored in Bean Lake." Thus DFWP's claim would be junior to the first appropriator's right, for which the Water Court awarded a priority date of 1864. It would be senior to the Bean appropriation of 1964. From our record, it appears that no other appropriator made claim to the use of Bean Lake waters in the adjudication process.

DFWP urges that its claim of water right can be sustained on two grounds: (1) recreational fish and wildlife purposes are beneficial uses which will support an appropriation right; and (2) for this type of an appropriation, no diversion of the waters is required.

The arguments of DFWP in support of its claim may be summarized: in-stream, in-lake, or in-source recreational fish and wildlife uses without a diversion are beneficial uses which support appropriation by the Department on behalf of the public. There is no question that the use in this case was established well prior to July 1, 1973. Art. IX, Sec. 3, 1972 Montana Constitution recognizes recreation as a beneficial use. The establishment by the legislature of "Murphy rights" in 1969 and 1973 shows that uses for recreational purposes are beneficial.

Further summarizing, we note that DFWP contends the Water Court itself is divided on the necessity of diversion. In this case the Water Court Judge found that a diversion was

necessary for a pre-1973 use right. In the O'Fallon Creek Basin, (case 42L-5 in the Water Court) and in the Red Water River Basin (case 40P-2 in the Water Court) the Water Court held that the Department of Interior, Bureau of Land Management, would have recognized appropriation claims for wildlife in instances where the Bureau acted under a congressional mandate to protect wildlife. In the Kootenai River Drainage (case 76D-48 in the Water Court) the construction and maintenance of fish ladders, fish passage facilities and the barrier dam and fish trap were recognized as constituting an appropriation by diversion on Young Creek and the Tobacco River. Further, the Department urges that the purpose of diversion is to give notice of the appropriated use by the appropriator and in this case the extensive efforts and expenditures by the Department in developing and managing the fishery clearly gave such notice though no diversion occurred. In other words, the actual application of the water to a beneficial use meets the requirements of intent or notice.

The respondents answer these contentions by insisting that an "existing right" must be a right to the use of water protected under the law as it existed prior to July 1, 1973. They claim that DFWP has not met the basic elements of a valid appropriation under the law prior to 1973, and that the claim of appropriation at this late date is simply an afterthought. The requirement of an intent to appropriate serves several elements, priority, quantity and the purpose of use. The most important function of diversion is notice that a water right is being appropriated. Respondents further contend that in the stocking and managing of Bean Lake, the Department had no intent at the time to make an appropriation on which to base a water right. The diversion requirement provides evidence of an intent that gives notice

to other water users of the specifics of the appropriation, citing Holmstrom Land Company v. Newland Creek Water District (1979), 185 Mont. 409, 605 P.2d 160.

These are the principal contentions of the parties. Both sides have also cited to us decisions of other states, but these are somewhat conflicting and depend in some instances on factors not present here, such as legislative action. We should note that DFWP relies particularly on Paradise Rainbows et al. v. Fish and Game Commission (1966), 148 Mont. 412, 421 P.2d 717. In that case Warren DePuy had constructed a dam on Armstrong Spring Creek, and had taken all of the flow of that water for the construction of fish ponds. He was directed by the Commission (predecessor of DFWP) to construct a fishladder over the dam pursuant to a statute. DePuy refused and the Commission brought an action for mandatory injunction to compel the building of the fish ladder. The Court denied the mandatory injunction but in dictum it stated:

> The Commission does not deny that DePuy has a valid appropriative right to the waters of Armstrong Spring Creek. In fact the Commission made no attempt to prove that the amount of water actually put to beneficial use by DePuy was less than the amount claimed and diverted. The Commission does maintain that the public has a prior right to the waters of the creek which would require DePuy to release some water through a fishladder. The public right urged by the Commission would be based on the fact that the public had used the creek as a fishing stream and natural fish hatchery before DePuy built his dam. Under the rule of Bullerdick v. Hermsmeyer, 32 Mont. 541, 554, 81 P. 334, DePuy could not use the water to the detriment of prior rights.
>
> Such a public right has never been declared in the case law of this state. California, an appropriation doctrine jurisdiction, whose constitutional provisions relating to water rights are virtually the same as Art. III, Sec. 15 of the

> Montana Constitution [1889] has recognized such a right and has upheld statutes requiring fishways (citing authority). Under the proper circumstances we feel that such a public interest should be recognized. This issue will inevitably grow more pressing as increasing demands are made on our water resources. An abundance of good trout streams is unquestionably an asset of considerable value to the people of Montana.
>
> While the Commission's argument is plausible, we cannot yield to it given the facts at hand. . . .

148 Mont. at 419, 420, 421 P.2d at 721.

We accept as given that the activities of the DFWP in stocking Bean Lake, maintaining the fishery resource, making studies of the Bean Lake surface levels and fish population, enforcing rules relating to motor boats, coupled with the general public use of Bean Lake for the purpose of recreation, wildlife, and fishing constituted a beneficial use of the waters within the meaning of the appropriation doctrine. In this case the Water Court itself determined that use was in fact beneficial. This Court has never closed the list of what comprises a beneficial use. See Stone, "Legal Battle Background on Recreational Use of Montana's Waters," 32 Mont. Law Review 1, 14 (1971).

Recreation is recognized as a beneficial use in Art. IX, Sec. 3, 1972 Montana Constitution.

The historical growth of Montana appropriation water law is well documented in our cases. See Stone, "Montana Water Law for the 1980's" (1981). It began with the needs of miners who engaged in placer mining and mill operations and nearly simultaneously with the needs of irrigators for farm lands. In these cases, the water was "captured" in the sense that the water was diverted from its main stream or channel and put to use by the appropriator. A completed appropriation meant an actual diversion of the water which

served any of several purposes. Diversion proved an intent to appropriate the water, Bailey et al v. Tintinger (1912), 45 Mont. 154, 122 P. 575, as did the capacity of the works Bailey, supra. In Toohey v. Campbell (1900), 24 Mont. 13, it was held that intent was determined by the extent of the farm tract actually reduced to possession and cultivated.

It cannot be disputed however that there were beneficial uses for which appropriation rights could be obtained which would not require diversion of the waters. Though some impoundment was involved, such use included hydroelectric power use of dams, and the impoundment of waters in reservoirs, although the latter included a capture of sorts.

The first appropriators in Montana acquired an appropriation right simply by putting the water to a beneficial use. Kienschmidt v. Binzel (1894), 14 Mont. 31. The first statutes relating to appropriation were enacted in this state in 1885. Even without complying with the statutes, however, a party, simply by putting the water to beneficial use, could acquire a valid appropriation right, Murray v. Tingley (1897), 20 Mont. 260 provided the stream was unadjudicated.

There is not any doubt that in all the time from the first settlers until 1972, the waters of Montana were being put to extensive recreational use by the public. The DFWP and its predecessors have a long history of sustaining fisheries in-lake and in-steam. Yet no court case, and no statute except for a Murphy right statute, recognized any kind of an appropriation right in the waters thus used. In truth, no Montana legal authority, deriving either from common law or statute, acknowledged that recreational, fish or wildlife uses, even though beneficial, gave rise to any water rights by appropriation under Montana law.

It was in this legal climate that the legislature adopted the first Murphy right statute in 1969. Chapter 345, Laws of 1969 amended § 89-801, R.C.M. (1947), by adding subsection (2) thereto, so that the section read in part as follows:

89-801. What waters may be appropriated. (1) The right to the use of the unappropriated water of any river, stream, ravine, coulee, spring, lake, or other natural sources of supply may be acquired by appropriation, and an appropriator may impound flood, seepage, and waste waters in a reservoir and thereby appropriate the same.

(2) But the unappropriated waters of the streams and portions of streams hereafter named shall be subject to appropriation by the fish and game commission of the state of Montana in such amounts only as may be necessary to maintain stream flows necessary for the preservation of fish and wildlife habitat. Such uses shall have a priority of right over other uses until the district court in which lies the major portion of such stream or streams shall determine that such waters are needed for a use determined by said court to be more beneficial to the public. The unappropriated water of other streams and rivers not named herein may be set aside in the future for appropriation by the fish and game commission upon the consideration and recommendation of the water resources board, fish and game commission, state soil conservation committee, the state board of health and approval of the legislature . . .

Section 89-801, R.C.M. (1947) as amended was in force and effect until 1973 when it was repealed. While it was in effect, the Fish and Game Commission was permitted to appropriate unappropriated waters in 12 blue-ribbon fishing streams named therein. Bean Lake was not named. The amended statute further expressly provided that no other appropriations would be allowed except upon the recommendations of certain boards of the state, and particularly the "approval of the legislature." Our

understanding is that the Fish and Game Commission, and its successors have made Murphy right appropriations as permitted under § 89-801 R.C.M. (1947).

The foregoing was the state of the law pertaining to water use rights when the state constitutional convention was held in 1972. Before that, in no sense, did DFWP or its predecessors claim any appropriative rights for recreational fish or wildlife purposes except as permitted under the Murphy right statute. Indeed, the evidence in this case shows that the publications issued by DFWP and its predecessors, and public statements made by persons holding responsible positions in the Department, all assumed that an appropriation right could not be acquired for those purposes. In so reporting, we do not intimate that the Department is bound by those expressions of opinion of its publications, or of its officers and employees. We report them as confirming the general opinion of the legal community that existed at the time. It is with that background of opinion that the dictum expressed in Paradise Rainbows, supra, can be understood.

The 1972 Montana Constitution provided that "all existing rights of the use of any waters for any useful or beneficial purpose are hereby recognized and confirmed." Art. IX, Sec. 3(1), 1972 Mont. Const. In McDonald v. State (Mont. 1986), 722 P.2d 590, 601, 34 St.Rep. 576, we said:

> There are two components to the Montana constitutional guarantee: There must be an existing right to the use of water, and the use must be for beneficial purpose . . .

While it might be argued that at the time of the adoption of the 1972 Montana Constitution, the in-stream and in-lake waters of the state were being put to beneficial use for recreation, fish and wildlife purposes, and that

- 14 -

therefore an appropriation right existed, it is clear that at the adoption of the Constitution, the constitutional framers thought otherwise.

As a part of Art. IX of the new Constitution, the convention adopted subsections (3) and (4) of Section 3. Those subsections provide:

(3) All surface, underground, flood, and atmospheric waters within the boundaries of the state are the property of the state for the use of its people and are subject to appropriation for beneficial uses as provided by law.

(4) The legislature shall provide for the administration, control, and regulation of water rights and shall establish a system of centralized records, in addition to the present system of local records.

When those subsections came before the convention for adoption, Delegate McNeil, supporting their adoption, spoke to the convention in this wise:

. . .

Subsection 3 is a new provision to establish ownership of all water in the state subject to use by the people. This does not, in any way, affect the past, present, or future right to appropriate water for beneficial uses and is intended to recognize Montana Supreme Court decisions and guarantee the State of Montana's standing to claim all of its waters for use by the people of Montana in manners involving other states and the United States government. Subsection 4 is a new provision to permit recreation and stockwatering to acquire a water right without the necessity of a diversion. This applies only to future rights and, of course, only to waters listed of which there are no present water rights. This subsection further provides that future agricultural and industrial water development will not be foreclosed by recreation, as it is left up to the Legislature to determine the method of establishing a future water right without a diversion; . . .

Verbatim Transcript, Montana Constitutional Convention, Vol. V, at 1301.

Subsection 4, referred to in the above quotation, was proposed by the Committee on Natural Resources and Agriculture. As proposed, subsection 4 would have provided that a diversion was not required for future acquisition of a water right, and would have given the legislature power to designate priorities between future acquired water rights. (Montana Constitutional Convention, Vol. II, at 552-553.) Subsection 4 did not make it through the convention to be included in the 1972 Montana Constitution. After several hours of debate, the subsection was deleted in its entirety on motion of Delegate McDonough. (Montana Constitutional Convention, Verbatim Transcript, Volume V, at 1301-1343.) By the adoption of Article IX, Section 3 in its present form, the Constitutional Convention left it to the legislature to provide appropriation rights for beneficial uses not theretofore recognized under our law.

The legislature did so act in 1973. It repealed the first Murphy right statute, § 89-801 R.C.M. (1947). Instead of an appropriation, the legislature provided that a government agency could reserve waters for existing or future beneficial uses in most of the principal streams of the state. Section 85-2-316, MCA. Such reservations, when granted, date from the order reserving the water adopted by the Board of Natural Resources and Conservation; they may not adversely affect any rights in existence at the time; and the Board has no authority to alter a water right that is not a reservation. Section 85-2-316(9), (12), MCA.

It is clear therefore that under Montana law before 1973, no appropriation right was recognized for recreation, fish and wildlife, except through a Murphy right statute. The prevailing legal theory was that some form of diversion

or capture was necessary for an appropriation even though some forms of non-diversionary water rights were given appropriation status. In this case the Water Court denied the appropriation water right claim "because of the lack of diversion, intent, and notice." Whatever the merits of the lack of diversion argument, the DFWP and the public could not have intended an appropriation where none was recognized by law, and for the same reason, adverse appropriators could not have had notice of such a claim. We therefore uphold the Water Court's decision that DFWP, for itself or for the public, had no appropriation right in Bean Lake, and no "existing right" therein which is protected by Art. IX, § 3(1) of the 1972 Montana Constitution.

DFWP raises two other issues, one relating to additional findings of fact requested by the Department which were not considered by the Water Court, and the second that the Water Court precluded the Department from inquiring into the water rights of the other appropriators in this case. At the outset of this opinion, we assumed all the facts for which the Department contended and none of those facts would change our consideration of the applicable law. Since DFWP had no appropriation water rights in Bean Lake, it was irrelevant to inquire into the kinds of water rights of the other appropriators against whom no objections were raised by other parties.

This opinion serves the office of a writ of supervisory control, without the necessity of the issuance of further writs or documents. We acknowledge with appreciation the several briefs submitted by amici curiae in this case. Let remittitur issue forthwith.

_John C. Sheehy_
Justice

- 17 -

We Concur:

_____
Chief Justice

_____

_____

_____

_____

_____
Justices