FILED

06/13/2017

*Ed Smith*
CLERK OF THE SUPREME COURT
STATE OF MONTANA

Case Number: DA 16-0320

DA 16-0320

IN THE SUPREME COURT OF THE STATE OF MONTANA

2017 MT 145

CLAIMANT: City of Helena,

        Claimant, Appellee
        and Cross-Appellant,

OBJECTORS: Community of Rimini,

        Objector and Appellee,

Andy R. Skinner,

        Objector and Appellant.

APPEAL FROM:    Montana Water Court, Cause No. 41I-67
                Honorable Loren Tucker, Water Judge

COUNSEL OF RECORD:

        For Appellant:

                John E. Bloomquist, Bloomquist Law Firm P.C., Helena, Montana

        For Appellee City of Helena:

                Thomas Jodoin, Helena City Attorney, Helena, Montana

                Candace C. Payne, Luxan & Murfitt, PLLP, Helena, Montana

                Christian D. Tweeten, Attorney at Law, Missoula, Montana

        For Appellee City of Rimini:

                Holly Jo Franz, Franz & Driscoll, PLLP, Helena, Montana

                Submitted on Briefs: January 25, 2017
                          Decided: June 13, 2017

Filed:

_____
                        Clerk

Justice Michael E Wheat delivered the Opinion of the Court.

¶1     Andy R. Skinner (Skinner) appeals and the City of Helena (Helena or City) cross-appeals from the order of the Montana Water Court, Upper Missouri Division, partially reversing and partially adopting the Water Master's Report.

¶2     We restate the issues on appeal and cross-appeal as follows:

*Issue One:  Is § 85-2-227(4), MCA, as applied to the City's water rights claim, impermissibly retroactive?*

*Issue Two:  Did the Water Court err in reinstating 7.35 cfs of Helena's Tenmile Creek water rights?*

*A.  Did the Water Court err in finding that § 85-2-227(4), MCA, should be applied to create a presumption of nonabandonment for the City?*

*B.  Did the Water Court correctly reject the Master's finding that Skinner had rebutted the presumption of nonabandonment?*

*Issue Three:  Did the Water Court err in finding that the City had abandoned 0.60 cfs of its Tenmile Creek water rights?*

*Issue Four:  Did the Water Court err in imposing specific place of use restrictions on Helena's decreed Tenmile Creek water rights?*

We affirm in part and reverse in part.

## FACTUAL AND PROCEDURAL BACKGROUND

¶3     This controversy involves two water rights claims filed by the City for the waters of Tenmile Creek, a stream located in the mountains southwest of Helena, Montana.[1]  Rising

---

[1] The claims, received by the Montana Department of Natural Resources and Conservation in April 1982, were designated as State of Claim Nos. 41I 89074-00 and 41I 89075-00.  Each of the claims received objections from Skinner and the claims and objections were eventually consolidated into Water Court Case No. 41I-67.

on the Continental Divide, the creek flows north between Red Mountain and Lee Mountain, before passing through the old mining community of Rimini, Montana. Upon reaching U.S. Highway 12, the stream turns east towards Helena and flows northeast, just beyond the City's northwest boundary.

¶4    In the mid-1800's, miners appropriated water from the stream for use in their mining operations. By 1886, the mines had become depleted and some of the miners sold their water rights to the Helena Water Works Company (Company). In 1903, a decree entitled *Whitcomb v. Helena Water Works* (Decree)[2] declared the Company to be the owner of the first two rights on the stream. The first right had a priority date of November 5, 1864, and entitled the Company to an appropriation of 225 miner's inches (MI) (claim number 41I 89074-00). The second right had a priority date of February 10, 1865, and entitled the Company to an appropriation of 325 MI (claim number 41I 890745-00). Taken together, the two rights to the stream total 550 MI, or 13.75 cubic feet per second (cfs).

¶5    At the time of the Decree, the Company used two points of diversion for the stream. The first point diverted 225 MI through an open ditch, running near Rimini, into a water treatment facility, and then into Helena through two sixteen-inch pipelines. The precise date of the pipeline's construction is unknown, but is thought to be around 1903. The second point diverted 325 MI four miles downstream from the treatment facility through an open channel known as the "Yaw Yaw" ditch. The City acquired the Company's facility and water rights in 1911. In 1919, the City ceased using the Yaw Yaw ditch for municipal

---

[2] *Whitcomb v. Helena Water Works*, Case No. 4989 (Mont. Dist. Ct. 1903).

purposes, but continued to lease the water for agricultural use and maintain the facilities for emergency purposes.

¶6     In 1921, the City replaced the open ditch running near Rimini with an eighteen-inch concrete diversion pipeline known as the "Rimini Pipeline," and added five new points of diversion along Tenmile Creek. After the City ceased using the Yaw Yaw ditch for municipal purposes, all of the creek's diversions flowed through the Rimini Pipeline. The pipeline has a capacity of 13.15 cfs, 0.60 cfs less than the combined total of Helena's two Tenmile Creek water rights.

¶7     The City continued to rely on the two sixteen-inch pipelines to deliver water from the treatment facility to Helena. By 1929, the City had identified the two sixteen-inch pipelines as the limiting factor in the Tenmile system; specifically, an engineering report from that year found that leakage, waste, and other factors restricted the capacity of the pipelines to 5.50 cfs. The report recommended construction of a new transmission pipeline. In 1948, the City installed a new twenty-four-inch pipeline. The pipeline enabled the City to transmit 13.15 cfs from the Rimini Pipeline, but has a capacity of 13.75 cfs.

¶8     Skinner owns junior water rights on Tenmile Creek. Both Skinner and the Community of Rimini objected to Helena's Tenmile Creek water right claims and the subsequent procedural background concerning the Water Court's adjudication of the City's claims spans two decades. In a report filed July 28, 2011, and a supplemental report filed January 13, 2012, Water Master Hugh B. McFadden, Jr. (the Master) found that the City abandoned 7.35 cfs of its water rights to Tenmile Creek and imposed specific place of use

4

restrictions on the City's water rights. On November 8, 2013, Water Judge Ted L. Mizner held that the Master erred in failing to apply Montana's presumption of municipal nonabandonment statute,[3] and restored the full decreed right of 13.75 cfs to the City. Judge Mizner also adopted the Master's place of use finding. Skinner appealed to the Montana Supreme Court and, on February 24, 2015, this Court remanded the case for further proceedings due to procedural errors and ambiguities in the Water Court's order.

¶9 On remand, Water Judge Loren Tucker adopted the Master's finding that the City had abandoned 7.35 cfs of its water rights claims under the common law. However, the Water Court then ordered the parties to brief whether the City may avoid abandonment under § 85-2-227(4), MCA, including whether the statute is constitutional.[4] On April 29, 2016, the court found that: 1) under § 85-2-227(4), MCA, the "evidence established a presumption that the City did not intend to abandon 7.35 cfs," which Skinner failed to rebut; and 2) the City abandoned 0.60 cfs in the Rimini Pipeline, the difference between the 13.15 cfs capacity of the pipeline and 13.75 cfs, the capacity decreed.

¶10 Skinner now appeals, and the City cross-appeals, the Water Court's order. Additional facts will be provided as necessary to dispose of the issues raised.

---

[3] This statute is codified at § 85-2-227(4), MCA.

[4] The Water Court also instructed the parties to brief whether the City could avoid abandonment under a separate theory of growing communities. Subsequently, both the Master and Water Court agreed that the growing communities doctrine is a common-law concept upon which § 85-2-227(4), MCA, is based. Since the parties are not presenting a separate challenge to the Water Court's determination based upon the doctrine, and since we agree that the Montana Legislature partially codified the doctrine in § 85-2-227(4), MCA, we will not separately address this issue in this Opinion.

**STANDARDS OF REVIEW**

¶11    In a case involving both a water master and the water court, two standards of review are applicable: the standard the water judge applies to the master's report and the standard we apply to the water court's opinion. *Skelton Ranch, Inc. v. Pondera Cnty. Canal & Reservoir Co.*, 2014 MT 167, ¶ 25, 375 Mont. 327, 328 P.3d 644. The water court reviews the master's findings of fact for clear error and the master's conclusions of law to determine whether they are correct. *Skelton Ranch*, ¶ 25. Applying these standards of review, the water judge may adopt, modify, or reject the master's report, in whole or in part, or may receive further evidence or recommit it with instructions. *Skelton Ranch*, ¶ 5.

¶12    We review the water court's order de novo, to determine whether it correctly applied the clear error standard of review to the master's findings of fact and whether its conclusions of law were correct. *Skelton Ranch*, ¶ 26. Whether the standard of review was applied correctly is a question of law. *Skelton Ranch*, ¶ 26. We review the water court's findings to determine whether they are clearly erroneous. *Skelton Ranch*, ¶ 26.

¶13    Clear error can be found by one of three ways:

> A factual finding may be clearly erroneous if it is not supported by substantial evidence. Even if supported by substantial evidence, the finding may be clearly erroneous if the trier of fact misapprehended the effect of the evidence. Even if supported by substantial evidence and the effect of the evidence is not misapprehended, a finding may be clearly erroneous if, in light of the evidence as a whole, the reviewing court is left with a definite and firm conviction that a mistake has been made.

*In re Eldorado Coop Canal Co.*, 2016 MT 94, ¶ 17, 383 Mont. 205, 369 P.3d 1034 (citing *Marks v. 71 Ranch, LP*, 2014 MT 250, ¶ 12, 376 Mont. 340, 334 P.3d 373). Substantial

6

evidence is evidence that a "reasonable mind might accept as adequate to support a conclusion, even if the evidence is weak or conflicting." *Skelton Ranch*, ¶ 27. To find substantial evidence there must be more than a scintilla of evidence but a preponderance of the evidence is not required. This standard is deferential, and not synonymous with the clear error standard. A reviewing court may still find a factual finding is clearly erroneous even though there is evidence to support it. *Skelton Ranch*, ¶ 27.

## DISCUSSION

¶14     *Issue One: Is § 85-2-227(4), MCA, as applied to the City's water rights claim, impermissibly retroactive?*

¶15     The City of Helena first argues that Skinner's appeal should be dismissed because he failed to comply with M. R. Civ. P. 5.1 and M. R. App. P. 27,[5] requiring that he notify the Attorney General of his constitutional challenge of § 85-2-227(4), MCA. Skinner contends that he is not challenging the constitutionality of § 85-2-227(4), MCA, and, as such, the procedural notice requirements do not apply in this case. Specifically, Skinner argues that since § 85-2-227(4), MCA, does not contain a retroactivity clause as required by § 1-2-109, MCA, it cannot be retroactively applied to him.

¶16     In 2005, the Montana Legislature amended § 85-2-227(4), MCA, to create a presumption of nonabandonment for all water rights claimed for municipal use. As amended, § 85-2-227(4), MCA, now reads:

---

[5] Under M. R. Civ. P. 5.1(a) and M. R. App. P. 27, a party challenging the constitutionality of a statute is required to give notice to the Attorney General of the existence of the constitutional issue.

(4) In a determination of abandonment made under subsection (3), the legislature finds that a water right that is claimed for municipal use by a city, town, or other public or private entity that operates a public water supply system, as defined in 75-6-102, is presumed to not be abandoned if the city, town, or other private or public entity has used any part of the water right or municipal water supply and there is admissible evidence that the city, town, or other public or private entity also has:

(a) obtained a filtration waiver under the federal Safe Drinking Water Act, 42 U.S.C. 300(f), et seq.;

(b) acquired, constructed, or regularly maintained diversion or conveyance structures for the future municipal use of the water right;

(c) conducted a formal study, prepared by a registered professional engineer or qualified consulting firm, that includes a specific assessment that using the water right for municipal supply is feasible and that the amount of the water right is reasonable for foreseeable future needs; or

(d) maintained facilities connected to the municipal water supply system to apply the water right to:

(i) an emergency municipal water supply;

(ii) a supplemental municipal water supply; or

(iii) any other use approved by the department under Title 85, chapter 2, part 4.

Section 85-2-227(4), MCA.

¶17 Assuming, arguendo, that Skinner is not making a constitutional argument in this case, we nevertheless conclude that the Water Court's application of § 85-2-227(4), MCA, to Skinner did not create a retroactive application of the law under § 1-2-109, MCA, because the effect of the 2005 amendments are procedural, not substantive, and thus fall outside the contemplation of § 1-2-109, MCA. Section 1-2-109, MCA, provides that "No law contained in any of the statutes of Montana is retroactive unless expressly so declared." However, a statute is not retroactive within the meaning of § 1-2-109, MCA, "merely because it draws upon antecedent facts for its operation." *Mordja v. Mont. Eleventh Judicial Dist. Court*, 2008 MT 24, ¶ 18, 341 Mont. 219, 177 P.3d 439 (quoting *State v.*

8

*Coleman*, 185 Mont. 299, 317, 605 P.2d 1000, 1012 (1979)). Rather, we have repeatedly held that "[a]lthough the general rule of law is that a statute is not to be applied retroactively, an exception to that rule is a change in a law that is merely procedural rather than substantive." *Saint Vincent Hosp. & Health Ctr. v. Blue Cross & Blue Shield*, 261 Mont. 56, 61, 862 P.2d 6, 9 (1993); s*ee Mordja*, ¶ 24.

¶18     Here, the Water Court found that since the amendments to § 85-2-227(4), MCA, merely changed the burden of proof as to the municipal abandonment inquiry, it created a procedural change which did not affect the vested rights of Skinner. We agree. In *In re Application for Change of Appropriation Water Rights Nos. 101960-41S & 101967-41S*, 249 Mont. 425, 816 P.2d 1054 (1991) (hereinafter *Royston*), senior water rights holders, the Roystons, applied for a change in the place of use of water rights and a change of use from flood irrigation to sprinkler irrigation. *Royston*, 249 Mont. at 426, 816 P.2d at 1056. Three junior water rights holders filed objections. *Royston*, 249 Mont. at 427, 816 P.2d at 1056. The Department of Natural Resources and Conservation (DNRC) denied the Roystons' application after conducting a contested case hearing wherein both the Roystons and the objectors introduced evidence on the effects of the proposed change of use. *Royston*, 249 Mont. at 427, 816 P.2d at 1056. The district court affirmed the DNRC's denial, finding that under a 1985 amendment to § 85-2-402, MCA, the applicant for a change of appropriation right has the burden of proof as to the nonexistence of adverse impact. *Royston*, 249 Mont. at 427, 816 P.2d at 1056.

9

¶19     The Roystons appealed, challenging the district court's application of the amended statute to them as an impermissible retroactive application of a statute. *Royston*, 249 Mont. at 429, 816 P.2d at 1057. In upholding the district court, we held that because the 1985 amendment to § 85-2-402, MCA, "merely modifie[d] the procedure for exercising a vested right" and because "[a] water right recognized by the 1972 Constitution does not include the right to not have to carry a burden of proof," the statute was not impermissibly retroactive. *Royston*, 249 Mont. at 429, 816 P.2d at 1057-58.

¶20     We conclude that *Royston* is directly on point to the case at bar. As in *Royston*, the 2005 amendments to § 85-2-227(4), MCA, merely change the assignment of the burden of proof; thus, it is a procedural change rather than a substantive one. Specifically, if the City can establish that is has used "any part" of the water right and also satisfies one of the four additional requirements under § 85-2-227(4)(a)-(d), MCA, the City is presumed not to have abandoned its water right. This creates a disputable presumption that Skinner may rebut. As such, because the statute only modifies the way in which abandonment is proved and does not directly affect a vested right, we conclude that it is a procedural modification that does not constitute a retroactive application of the law. The Water Court correctly determined that the Master's conclusion as to the retroactive application of § 85-2-227(4), MCA, was clearly erroneous. We now consider whether the Water Court correctly applied the statute to the facts in this case.

10

¶21 *Issue Two: Did the Water Court err in reinstating 7.35 cfs of Helena's Tenmile Creek water rights?*

¶22 Skinner also appeals the Water Court's finding that the City did not intend to abandon 7.35 cfs under § 85-2-227(4), MCA. The City contends that the court's findings were not clearly erroneous because Skinner produced no direct evidence showing the City intended to abandon any portion of its Tenmile Creek water rights. Given our disposition of the first issue above and, consequently, the Master's failure to analyze whether the City met the statutory criteria for the presumption of municipal nonabandonment, we now need to determine if: 1) the Water Court's findings as to the application of § 85-2-227(4)(b)-(d), MCA, to this case are clearly erroneous; and 2) whether the Water Court correctly rejected the Master's findings as to whether Skinner successfully established an intent to abandon.

*A. Did the Water Court err in finding that § 85-2-227(4), MCA, should be applied to create a presumption of nonabandonment for the City?*

¶23 "Abandonment of a water right requires both non-use and intent to abandon." *Skelton Ranch*, ¶ 52 (citing *79 Ranch v. Pitsch*, 204 Mont. 426, 432, 666 P.2d 215, 218 (1983)). However, under § 85-2-227(4), MCA, a municipal water user is entitled to create a presumption of nonabandonment if "a city, town, or other public or private entity that operates a public water supply system" shows that it has: 1) "used any part of the water right"; and 2) met the requirements of one of the four criteria set forth in subsection 4(a) through 4(d).

11

¶24  The Water Court found, and the parties do not dispute, that the City has continuously and partially used each water right since the date of the Decree. The Water Court then found that the City satisfied the criteria of § 85-2-227(4)(b)-(d), MCA, and that the Master erred in finding that Skinner had rebutted the presumption of nonabandonment.

¶25  The Water Court first determined that the City met the requirements under subsection (4)(b) of § 85-2-227, MCA, because the court found that the City's construction of the diversion pipeline in 1921 evidenced an intention to plan for future growth. A municipal water user can establish a presumption of nonabandonment if there is admissible evidence that a city has "acquired, constructed, or regularly maintained diversion *or* conveyance structures for the future municipal use of the water right." Section 85-2-227(4)(b), MCA (emphasis added). The Water Court considered the fact that the larger capacity diversion pipeline fed into two, smaller capacity transmission lines, thus restricting the City's beneficial use to 5.50 cfs. The court found the construction of the diversion pipeline sufficient to meet the statute and determined that it was unnecessary for a municipal water user to construct both a diversion structure and a conveyance structure for future use given that the statute is written in the disjunctive, as emphasized above.

¶26  We conclude that the Water Court did not err in finding that the construction of the Rimini Pipeline established a presumption of municipal nonabandonment under subsection (4)(b) of § 85-2-227, MCA. The court found that the City built the 1921 diversion pipeline, knowing that the two 1903 transmission pipelines could only deliver a portion of its capacity for beneficial use. As the Water Court stated, "The most reasonable inference

12

from this conduct is that the City was planning for future growth; otherwise the City could have saved taxpayer money by constructing a smaller diversion pipeline." We conclude that the Water Court did not err in finding that the construction of the Rimini Pipeline in 1921 established that the City intended to use the municipal water right in the future, thus creating a presumption of nonabandonment under § 85-2-227(4)(b), MCA.

¶27 The Water Court also found that the City met the requirements of subsection (4)(c) of § 85-2-227(4)(c), MCA, because the City commissioned a 1929 engineering report which recommended construction of a new transmission pipeline to allow the City to make full use of its water rights. Under § 85-2-227(4)(c), MCA, the presumption of municipal nonabandonment may also be established if a city has "conducted a formal study, prepared by a registered professional engineer or qualified consulting firm, that includes a specific assessment that using the water right for municipal supply is feasible and that the amount of the water right is reasonable for foreseeable future needs." While the Water Court found that the report did not contain specific terms relating to the City's "reasonable for foreseeable future needs," the court nevertheless found ample evidence in the report to indicate that "the engineers believed the water right to be reasonable for foreseeable future needs." Because the report concluded that a new transmission line was needed to make full use of the City's water rights, to meet both the City's future growth and its current

13

demand under certain circumstances,[6] we conclude that the Water Court did not err in finding that the report met the requirements of § 85-2-227(4)(c), MCA.

¶28 Finally, the Water Court found that the City also met the criteria under subsection (4)(d)(i) of § 85-2-227, MCA, because the court determined that the City maintained the Yaw Yaw ditch for other purposes, including emergency use. A municipal water user qualifies for the presumption of nonabandonment if it "maintained facilities connected to the municipal water supply system to apply the water right to . . . an emergency water supply." The court relied on a 1925 report on fire defense which indicates that the City reserved use of the Yaw Yaw pumping station for fire defense purposes. The court also cited to the report's finding that the City maintained a pipe connecting the pumping station to a "flume and open ditch from Ten Mile Creek." As such, the Water Court found that the City met the criteria of § 85-2-227(4)(d)(i), MCA, because the evidence demonstrated that the City maintained facilities connected to the water supply to use in emergency situations. We conclude that the Water Court did err in finding a presumption of municipal nonabandonment based on the 1925 fire defense report.

*B. Did the Water Court correctly reject the Master's finding that Skinner had rebutted the presumption of nonabandonment?*

¶29 In his July 28, 2011 report, the Master found that, despite his conclusion that § 85-2-227(4), MCA, did not apply in this case, Skinner had nonetheless rebutted any

---

[6] The Water Court cited the report's determination that while the quantity of water supplied to the City "is ample for ordinary domestic consumption," it is "slightly deficient during the maximum demand of irrigation season, and seriously deficient when called upon to supply both the maximum domestic consumption and the amount required for adequate fire protection."

presumption of nonabandonment because the evidence established that the City: 1) constructed transmission lines that could not carry all of its water; 2) abandoned the Yaw Yaw ditch; and 3) declared that it had "ample water for as long a time as the needs of the city can forecast with any degree of accuracy." The Water Court determined that the Master's findings were clearly erroneous and we agree.

¶30 "A disputable presumption may be overcome by a preponderance of evidence contrary to the presumption. Unless the presumption is overcome, the trier of fact must find the assumed fact in accordance with the presumption." M. R. Evid. 301(2).

¶31 The Water Court first determined that the Master erred in his determination regarding the persuasive effect of the transmission lines capacity because: 1) the City continued to use water from the Yaw Yaw ditch for various purposes, even after the lines were constructed; and 2) as cited above, the 1929 engineering report attributed the pipelines' limited capacity to friction, leakage, waste, and other losses that the City could not have predicted when it constructed the pipelines in 1903. The Water Court also determined that the Master erred in concluding that the agricultural leases on the ditch and the use of the water for emergency purposes were irrelevant to whether the City intended to abandon the Yaw Yaw ditch.[7] Lastly, the Water Court concluded that the Master misapprehended the effect of a 1935 report entitled the "Condensed Report of the Helena

---

[7] In doing so, the court also pointed to the Master's erroneous conclusion of law that the growing communities doctrine does not apply when the Montana Legislature codified this common-law concept in § 85-2-227(4), MCA.

Water Works System." While the Master attempted to use the report to support its finding that the City did not require or foresee the need to use more than just a portion of its water rights,[8] the Water Court clarified that "[t]he statement that the City had 'ample water' referred to the sources of supply, not its distribution." The court went on to discuss the distribution section of the report which describes the two transmission lines as "the limiting factor in the Ten Mile system" and details conditions under which the current water supply would be insufficient to meet the demand of both domestic and fire use. Based on the court's comprehensive review of the report, it concluded that the report "does not suggest intent to abandon because of undersized delivery system components."

¶32 Upon review of the record and based on the Water Court's reasoning above in its thorough consideration of the evidence presented to rebut the City's presumption of nonabandonment, we agree with the court that the Master erroneously relied upon, or misapprehended the effect of, the evidence in this case and thus clearly erred in determining that the City abandoned a portion of its water rights. As such, the Water Court correctly applied the clear error standard of review in concluding that Skinner failed to rebut the City's presumption of nonabandonment by a preponderance of the evidence.

---

[8] The Water Court explained the report as follows:

The Condensed Report examines the watershed areas and provides a table of the flow into the Tenmile Reservoir. After adding the sources of bedrock water supply, the report provides a table with "the minimum flow from the various sources contributing to the water supply of the City of Helena." The report stated that, "the present sources of water supply to the City of Helena as now developed are capable of delivering ample water for as long a time as the needs of the city can be forecast with any degree of accuracy."

¶33    *Issue Three: Did the Water Court err in finding that the City had abandoned 0.60 cfs of its Tenmile Creek water rights?*

¶34    The Master also determined that the City abandoned 0.60 cfs, the difference between the amount decreed, 13.75 cfs, and the capacity of the Rimini Pipeline, 13.15 cfs. The Water Court determined the Master's findings to be correct. On cross-appeal, the City now challenges these determinations on the ground that the Water Court erred in failing to apply § 85-2-227(4), MCA, to the entirety of the Tenmile Creek water rights. Skinner contends that the court's determination was correct because the Master's report properly recognized that, despite § 85-2-227(4), MCA, evidence of conveyance capacity and beneficial use limitations necessarily limit the City's water rights.

¶35    The Water Court found that the Master did not err in finding that the City was not entitled to a presumption of nonabandonment under § 85-2-227(4), MCA, because the City presented no evidence that it ever intended to increase its diversion capacity, either in the Rimini Pipeline or in the form of additional diversions, as required to create the presumption under § 85-2-227(4)(b), MCA. Consequently, the court upheld the Master's application of the common-law test of abandonment and his finding that the period of nonuse between 1948 and 2011 was sufficient to raise a presumption of intent to abandon. The Water Court erred in its review of the Master's findings and we reverse.

¶36    By way of background, the 1999 amendments to § 85-2-227, MCA, as introduced by Senate Bill 235, gave municipalities protection from abandonment similar to the current

17

statute, but limited the provisions therein to A-closed waters.[9] 1999 Mont. Laws 689-90.

During the discussion of SB 235 in the Committee on Natural Resources, the bill's sponsor, Senator Jack Wells, stated that the bill "recognizes certain activities by municipal organizations that would suffice to guarantee their water rights in future years" and that "the major concern is long term protection." S. Comm. on Natural Res., *Hearing on SB 235*, 56th Leg., Reg. Sess. (Mont. Jan. 25, 1999). Additionally, one of the bill's proponents, Representative Cindy Younkin, further explained that "SB 235 will . . . partially codify what is known as the *great and growing cities doctrine* which has been espoused by the Supreme Court of other states. It originally came out of Colorado's

---

[9] The 1999 amendment added the following language to § 85-2-227, MCA:

(4) In a determination of abandonment made under subsection (3), a water right that is claimed for municipal use from a water classified by the board of environmental review as of January 1, 1999, as A-Closed under administrative rule and that is claimed by a city, town, or other public or private entity that operates a public water supply system, as defined in 75-6-102, is presumed to not be totally or partially abandoned if there is admissible evidence that the city, town, or other public or private entity has:
(a) used any part of the water right for municipal water supply;
(b) obtained a filtration waiver under the federal Safe Drinking Water Act, 42 U.S.C. 300(f), et seq.;
(c) acquired, constructed, or maintained diversion or conveyance structures for the future municipal use of the water right;
(d) conducted a formal study of the reasonably expected municipal water supply needs or supplies of the city, town, or other public or private entity;
(e) conducted a formal environmental or engineering study for the feasibility of using the water right for municipal supply;
(f) expended funds to protect water quality of the A-Closed waters; or
(g) maintained facilities to apply the water right to an emergency or supplemental municipal water supply.

Supreme Court. . . ." S. Comm. on Natural Res., *Hearing on SB 235*, 56th Leg., Reg. Sess. (Mont. Jan. 25, 1999) (emphasis added).

¶37 In 2005, the Legislature passed Senate Bill 20, "removing the requirement that a municipality diverts its water from an A-Closed water body in order to qualify for the consideration for nonabandonment of a municipal water right. . . ." 2005 Mont. Laws 33-34. Thus, the 2005 amendments expanded the growing communities doctrine to class A-1 drainages such as Montana's Tenmile. We note that the purpose of the doctrine, as it was developed in Colorado, was to "assure an adequate [water] supply to the public which it serves" and, according to that state's highest court, "it is not speculation but the highest prudence on the part of the city to obtain appropriations of water that will satisfy the needs resulting from a normal increase in population within a reasonable period of time." *Denver v. Sheriff*, 96 P.2d 836, 841 (1939).

¶38 Section 85-2-227(4), MCA, comports with the purpose of the growing communities doctrine by creating a presumption of nonabandonment when a city is planning for its future water needs and requires flexibility in such planning efforts.[10] Consequently, if a city takes the affirmative steps prescribed by the statute, such efforts are protected and

---

[10] *See Sheriff*, 96 P.2d at 841 (explaining that "[t]he concern of the city is to assure an adequate supply to the public which it serves. In establishing a beneficial use of water under such circumstances the factors are not as simple and are more numerous than the application of water to 160 acres of land used for agricultural purposes. A specified tract of land does not increase in size, but populations do, and in short periods of time. With that flexibility in mind, it is not speculation but the highest prudence on the part of the city to obtain appropriations of water that will satisfy the needs resulting from a normal increase in population within a reasonable period of time.").

apply to the entirety of a municipality's water right, despite a period of non-use. Indeed, as the Water Judge stated in his order, "the whole purpose of [§] 85-2-227(4), MCA, is to presume nonabandonment in precisely those circumstances when intent to abandon would otherwise be presumed (e.g. based on a long period of nonuse)."

¶39     In this case, the Water Court erred in failing to recognize that both the City's construction of the diversionary structure in 1921 *and* its construction of the twenty-four-inch conveyance structure in 1948 created a presumption of nonabandonment under § 85-2-227(4)(b), MCA. As the Water Court stated earlier in its order, "Nothing in the statute requires the City to construct both diversion structures and conveyance structures." Accordingly, just as the court found the City's construction of the 1921 Rimini Pipeline sufficient to create a presumption of nonabandonment under subsection (4)(b), even though it was unable to carry the 13.75 cfs decreed, the City's construction of the twenty-four-inch conveyance structure is likewise sufficient to create the same presumption, especially given that it was built to transmit the entire 13.75 cfs decreed. Indeed, in constructing a conveyance structure large enough to transmit the entire 13.75 cfs, it can be inferred that the City sought to make use of the entirety of its water right, in contemplation of the City's future growth. As discussed above, Montana's codification of the growing communities doctrine seeks to ensure that municipalities may appropriate water for future needs and we find that the City was planning for its anticipated requirements. As such, we conclude that the Water Court erred in upholding the Master's determination and further conclude that the City met the criteria for the presumption of

20

nonabandonment as it applies to the whole system stemming from Helena's water right on Tenmile Creek.[11]

¶40    *Issue Four: Did the Water Court err in imposing specific place of use restrictions on Helena's decreed Tenmile Creek water rights?*

¶41    The City also contends on cross-appeal that the Water Court erred in affirming the Master's conclusion placing geographical limitations on the City's rights which, as decreed in 1903, have a place of use element that is constitutionally protected. The Master dismissed the constitutional challenge because the City failed to comply with M. R. Civ. P. 5.1(a), requiring that a party challenging the constitutionality of a state statute promptly notify the Attorney General of his constitutional challenge. The Water Court adopted the Master's place of use findings.

¶42    Under M. R. Civ. P. 5.1(a), a party challenging the constitutionality of a statute is required to give notice to the Attorney General of the existence of the constitutional issue. The failure to file a timely notice of a constitutional challenge results in a party failing to "procedurally comply with an essential condition precedent, thus precluding this Court from reaching the constitutional challenge." *Russell v. Masonic Home of Mont., Inc.*, 2006 MT 286, ¶ 20, 334 Mont. 351, 147 P.3d 216 (quoting *Boettcher v. Mont. Guar. Fund*, 2006 MT 127, ¶ 10, 332 Mont. 279, 140 P.3d 474).

---

[11] Since we are reversing the Water Court with respect to the 0.60 cfs under § 85-2-227(4)(b), MCA, and remanding this case for entry of judgment awarding the City its entire 13.75 cfs, we need not address whether the City also qualified for a presumption of nonabandonment under the other subsections of the statute.

¶43 Here, the City argues that it is not challenging the constitutionality of a statute. However, the City's reply brief states that it "brings an 'as applied' challenge based on the state's requirements for a specific place of use for the City's unique decreed rights." In turn, Montana's "requirements for a specific place of use" is found in § 85-2-234(6)(e), MCA, which states that a final water rights decree must include a place of use.[12] M. R. Civ. P. 5.1(a) does not distinguish between as-applied and facial constitutional challenges, but rather states that when a party "files a pleading, written motion, or other paper challenging the constitutionality of a state statute," the party "must promptly file a notice of constitutional question stating the question and identifying the paper that raises it, and serve the notice and paper on the state attorney general. . . ."

¶44 The Master found the following in his July 28, 2011 order:

> Beginning in 2010, the City contended that specifying a place of use for its claims is in violation of its constitutional rights. If the City's quarrel is with § 85-2-234(6)(e) ("the final decree must state . . . the place of use . . ."), either as written or as applied, then the City must give notice to the court and to the attorney general as required by [M. R. Civ. P. 5.1(a)]. No such notice has been filed. The court should not speculate as to what constitutional provisions are alleged to have been violated, when and how; nor will the court search the record for facts to support the City's contention or locate legal authority to make the City's case.

---

[12] Section 85-2-234(6)(3), MCA, states:

   (6) For each person who is found to have an existing right arising under the laws of the state of Montana, the final decree must state:

   . . .

   (e) the place of use and a description of the land, if any, to which the right is appurtenant . . . .

22

¶45 While the City contends that its appeal is "limited to the argument that its rights as decreed in 1903 have a place of use element that is constitutionally protected," the City cannot make this argument without also arguing why it is unconstitutional for § 85-2-234(6)(e), MCA, to apply to their 1903 decreed rights. As such, we cannot say that the Master and the Water Court erred in finding that the City failed to procedurally comply with M. R. Civ. P. 5.1(a).

**CONCLUSION**

¶46 For the foregoing reasons, the Water Court's opinion is affirmed in part, reversed in part, and remanded for the entry of an amended judgment awarding the City its entire 13.75 cfs Tenmile Creek water right.


/S/ MICHAEL E WHEAT

We Concur:

/S/ MIKE McGRATH
/S/ DIRK M. SANDEFUR
/S/ JAMES JEREMIAH SHEA


Justice Jim Rice, dissenting.

¶47 In brief fashion, the Court dispenses with Skinner's retroactivity argument by reasoning, as the Water Court did, that § 85-2-227(4), MCA, "merely changed the burden of proof as to the municipal abandonment inquiry," and is therefore the same kind of change deemed to be "procedural" in *Royston*, which the Court reasons "is directly on point." Opinion, ¶¶ 18, 20. The Court's analysis indicates that the changes brought about

23

by the statute are not significant and thus concludes that the statute is not retroactive. Opinion, ¶¶ 17–20. However, a proper analysis demonstrates clearly that the statute has changed the law substantively and decisively, far beyond the burden-of-proof issue deemed to be a procedural change in *Royston*, and has impacted established prior rights in a manner that renders it an impermissible retroactive provision under § 1-2-109, MCA, and our case law. Any possible doubt about that proposition is resolved by the Court's declaration that the statute adopts, for the first time in the history of Montana water law, the Growing Communities Doctrine.

¶48 The question of whether a statute is retroactive appears initially to be a simple inquiry, but the appearance is deceptive, and can lead to an inadequately analyzed decision. Determining whether a law creates a procedural or substantive impact upon established rights requires an understanding of the nature and operation of those rights, which, under Montana water law, draws into the discussion our precedent addressing constitutional principles governing water rights. About that, a clarifying word is necessary at the start. I agree with the Court that we are not here presented with a constitutional challenge to § 85-2-227(4), MCA. Skinner did not give notice of a challenge and insists he has not brought one. Consequently, I do not address or reach any conclusions about the constitutionality of the statute. However, reference to constitutional precedent herein is necessary to explain the legal nature of water rights for purposes of determining whether the statute has impacted those rights substantively, and is therefore retroactive in effect.

¶49　As decreed in the same litigation that decreed the water rights now held by the City, Skinner holds undivided interests in four water rights totaling 10.02 CFS, dating from March 31, 1865 to April 30, 1870, in Ten Mile Creek downstream from the City's diversions. *Whitcomb v. Helena Water Works*, No. 4989, Mont. 1st Jud. Dist. Ct. (Mar. 28, 1903).[1]　Skinner's water rights, like the City's, are decreed and vested rights that existed upon ratification of the 1972 Constitution, which provided:　"All existing rights to the use of any waters for any useful or beneficial purpose are hereby recognized and confirmed." Mont. Const. art. IX, § 3(1).　This constitutional provision is "self-executing," *Gen. Agric. Corp. v. Moore*, 166 Mont. 510, 515, 534 P.2d 859, 862 (1975), and "prevents the State from affecting rights vested at the time the Constitution was adopted other than through the exercise of Constitutionally provided powers such as eminent domain, Mont. Const. Art. II, sec. 17, or the general police power, and without affording due process of law, Mont. Const. Art. I, sec. 17." *In re Powder River Drainage Area*, 216 Mont. 361, 375–76, 702 P.2d 948, 957 (1985).

¶50　Importantly, there are "two components to the Montana Constitutional guaranty: there must be an *existing right* to the use of water, and the use must be for a *beneficial purpose*." *McDonald v. State*, 220 Mont. 519, 525, 722 P.2d 598, 601 (1986) (emphasis added).　As the Court explained:

---

[1] Skinner, along with Carol A. Skinner, owns a undivided 21/440 interest in: Claim 41I 90189-00 (1.88 CFS, decreed date of April 30, 1870); Claim 41I 90190-00 (4.38 CFS, decreed date of March 31, 1865); Claim 41I 90191-00 (1.88 CFS, decreed date of April 30, 1883); and Claim 41I 90192-00 (1.88 CFS, decreed date of May 31, 1865).

Montana has always protected, by law and the decisions of this Court prior to 1972, and by the Montana Constitution since 1972, any beneficial irrigation right within the original appropriation of water. *It is quite apparent from all the pre-1973 water cases in Montana that the courts look to beneficial use as the essential criterion in determining suits between water claimants.*

*McDonald*, 220 Mont. at 525, 722 P.2d at 602. (Emphasis added.) Made clear from the entirety of our precedent, including cases applying the 1972 Constitution, is that protected water rights consist of those rights existing prior to 1973 for which the water was put to a *beneficial use*. *E.g.*, *Murray v. Tingley*, 20 Mont. 260, 268–69, 50 P. 723, 725 (1897); *Mettler v. Ames Realty Co.*, 61 Mont. 152, 159–60, 201 P. 702, 703–04 (1921); *Kelly v. Teton Prairie LLC*, 2016 MT 179, ¶ 11, 384 Mont. 174, 376 P.3d 143 ("[A] water right could be acquired by taking possession of water on the public domain and putting it to beneficial use."). The beneficial use requirement is a cornerstone, pre-1973 legal concept that the law continues to enforce, now by statute. A pre-1973 water right is a "right to the use of water that would be protected *under the law as it existed prior to July 1, 1973*." Section 85-2-102(12), MCA. (Emphasis added.)

¶51    Further, a water right is a property right. *Brennan v. Jones*, 101 Mont. 550, 567, 55 P.2d 697, 702 (1936) ("[I]t is settled by the decisions of this court that such a right is property which may be disposed of apart from the land on which it has been used."). Both the *amount* of water and the *priority* for its use are substantive parts of that property right:

> Property rights in water consist not alone in the amount of the appropriation[,] but, also, in the priority of the appropriation. It often happens that the chief value of an appropriation consists in its priority over appropriations in the same natural stream. Hence, to deprive a person of his priority is to deprive him of a most valuable property right.

26

*Gen. Agric. Corp.*, 166 Mont. at 517, 534 P.2d at 863 (quoting *Whitmore v. Murray City*, 107 Utah 445, 453, 154 P.2d 748, 751 (1944)); *accord* § 85-2-401(1), MCA ("As between appropriators, the first in time is the first in right."); *Kelly*, ¶ 11.

¶52    Because a water right is founded on application of the water for a *beneficial use*, a water right holder may lose the water right through abandonment. *In re Musselshell River Drainage Area*, 255 Mont. 43, 47, 840 P.2d 577, 579 (1992) ("Water rights are thus inherently different from other rights or interests not fundamentally premised or conditioned on *use* of the particular right or interest; necessarily, then, abandonment of a water right is a question distinct from abandonment of a right created in a different manner." (emphasis in original)). About this characteristic of water rights, we have held that "when the appropriator, or his successor in interest, abandons and ceases to use the water for such [a beneficial] purpose, the right ceases." *Power v. Switzer*, 21 Mont. 523, 529, 55 P. 32, 35 (1898). We have held that a water right may be lost in its entirety by abandonment, *In re Adjudication of Water Rights of Clark Fork River*, 254 Mont. 11, 15-17, 833 P.2d 1120, 1123-24 (1992) [hereinafter *Deer Lodge*] (finding the City of Deer Lodge had abandoned two water rights in entirety), or that it may be *partially lost by partial abandonment*, where the water right holder had ceased using the entire right. *Power*, 21 Mont. at 530, 55 P. at 35 (holding plaintiff only retained four inches of water for domestic purposes out of their larger prior water right used for mining and domestic purposes); *Holmstrom Land Co. v. Meagher Cnty. Newlan Creek Water Dist.*, 185 Mont. 409, 423-24,

27

605 P.2d 1060, 1068-69 (1979) (finding abandonment of all but 80 miners inches of the original 337 miners inches in the water right through nonuse).

¶53    "Two elements are necessary for the abandonment of a water right: nonuse of the water associated with the water right and intent to abandon the water right." *Deer Lodge*, 254 Mont. at 15, 833 P.2d at 1123 (citing *Shammel v. Vogl*, 144 Mont. 354, 359, 396 P.2d 103 (1964)).  We have held that nonuse, in and of itself, is sufficient evidence to prove an intent to abandon.  *79 Ranch*, 204 Mont. at 432, 666 P.2d at 218 ("[T]he evidence clearly shows at least forty years of continuous nonuse of the water rights . . . such a long period of nonuse is *strong evidence of an intent to abandon* the water rights." (emphasis added)); *Smith v. Hope Mining Co.*, 18 Mont. 432, 438, 45 P. 632, 634 (1896) ("The nonuser [sic] of water for so long a period [9 years], and especially a period longer than the statute of limitations, is certainly *very potent evidence, if it stood alone, of an intention to abandon*." (emphasis added)); *Holmstrom Land Co.*, 185 Mont. at 424, 605 P.2d at 1069 ("Seventy-five years of nonuse is sufficient to provide 'clear evidence' of abandonment."); *Deer Lodge*, 254 Mont. at 16, 833 P.2d at 1123 (finding "twenty-three plus" years of nonuse by the city of Deer Lodge was abandonment).  "[S]uch a long period of continuous nonuse [40 years] raises the rebuttable presumption of an intention to abandon, and shifts the burden of proof onto the nonuser to explain the reasons for nonuse.  *This conclusion is highly consistent with the fundamental policy that a water right does not mean possession of a quantity of water, but its beneficial use*." *79 Ranch*, 204 Mont. at 432-33, 666 P.2d at 218 (emphasis added).  Thus, in addition to holding that nonuse can be sufficient, even if

28

"it stood alone," to prove abandonment, we have explained that the concept of abandonment is linked to the defining element of a water right, beneficial use. The law of abandonment is an inherent part of the law of beneficial use.

¶54   With this understanding of the nature of water rights, I turn to § 85-2-227(4), MCA, and the dispositive question of whether it is retroactive. The statute is not expressly retroactive, but "[i]mpermissible retroactive application of a statute occurs when it is applied to divest or impair vested rights acquired under prior law, or when it creates a new obligation, imposes a new duty or attaches a new disability in respect to transactions already passed." *Bull Lake Fire Dist. v. Lincoln Cnty.*, 2013 MT 342, ¶ 16, 372 Mont. 469, 313 P.3d 174 (emphasis added) (citing *C. Loney Concrete Constr., Inc. v. Emp't Rels. Div., Uninsured Emp'rs' Fund*, 1998 MT 230, ¶ 18, 291 Mont. 41, 964 P.2d 777). Laws that "*produce a different legal result*" are retroactive and, as such, inapplicable to claims rising prior to the statute's enactment. *Porter v. Galarneau*, 275 Mont. 174, 185, 911 P.2d 1143, 1150 (1996) (emphasis added); *accord Thayer v. Hicks*, 243 Mont. 138, 157, 793 P.2d 784, 796 (1990). In contrast, merely "procedural" changes are not retroactive. *Saint Vincent Hosp. & Health Ctr. v. Blue Cross & Blue Shield of Mont.*, 261 Mont. 56, 61, 862 P.2d 6, 9 (1993).

¶55   Section 85-2-227(4), MCA, creates a new presumption of non-abandonment for a city (or a privately owned utility serving a city) when it "has used *any part* of the water right . . . and there is admissible evidence" the city or other entity took one of several other nonuse actions, such as conducting a formal study of the municipal water system. Section

29

85-2-227(4)(c), MCA (emphasis added). The Court concludes that this statute is not retroactive because it has the same effect as the statute in *Royston*, which we held was procedural, not substantive. In *Royston*, the Roystons challenged the Water Use Act's provision that shifted the burden of proof regarding a change of appropriation from the objector (to prove adverse impact) to the applicant (to prove no adverse impact). *Royston*, 249 Mont. at 427-29, 816 P.2d at 1056-57. They argued that "because their water rights are existing water rights recognized by the 1972 Montana Constitution, construing the statute as changing the burden of proof and placing it on the applicant is an impermissible retroactive application of a statute because it impairs vested rights acquired pursuant to the 1972 Montana Constitution." *Royston*, 249 Mont. at 428-29, 816 P.2d at 1057. We rejected that argument, holding that "[a] water right recognized by the 1972 Constitution does not include the right to not have to carry a burden of proof. This Court has held that the application of statutory procedures to water rights vested under the 1972 Montana Constitution is not unconstitutional." *Royston*, 249 Mont. at 429, 816 P.2d at 1057. We thus concluded that the burden change was not a retroactive law because "[s]tatutes that modify the procedure for exercising a vested right or carrying out a duty do not constitute retroactive legislation." *Royston*, 249 Mont. at 429, 816 P.2d at 1058.

¶56 *Royston* involved purely a shift of the burden of proof in a water case. Neither the substance of the law nor the kind or quantum of evidence necessary to prevail was altered by the statute at issue in *Royston*. Although the burden of proof was shifted between the parties, the substantive issue remained the same: whether there had been an adverse

impact. Here, much more is at issue. Beyond merely shifting a burden of proof by granting a presumption in favor of the city under certain circumstances, § 85-2-227(4), MCA, also alters the substantive law of abandonment and the evidence necessary to prevail on the issue of abandonment, when a city is a party. The substantive law has been changed.

¶57 Setting aside the mere change in the presumption and the burden of proof from one party to another—held permissible as a procedural change in *Royston*—§ 85-2-227(4), MCA, alters the substantive law of abandonment by permitting a municipality to acquire its favorable presumption even though it has used only *part* of its water right. As explained above, the common law had long held that partial use of a water right could trigger partial abandonment of the right—regardless of other actions taken by the water right holder supportive of the right. *Power*, 21 Mont. at 528-31, 55 P. at 34-35 (noting evidence that plaintiff had allowed excess water diverted, through no intentional means, to naturally flow through dryland hay and thus increased the crop, showed no actual intent to use it beneficially, thus the plaintiff only retained the part of the water right put to beneficial use, the domestic uses); *Holmstrom Land Co.*, 185 Mont. at 424, 605 P.2d at 1069 (holding only 80 miners inches of an originally 337 miners inch water right was retained because, for seventy-five years, the irrigated land could only accommodate and put to beneficial use 80 miners inches); *Deer Lodge*, 254 Mont. at 16, 833 P.2d at 1123 ("Deer Lodge's evidence that it carried the water rights as assets on its books is not sufficient to rebut the presumption of abandonment [established by 23 years of nonuse]."). This was, as noted above, because the common law of abandonment is inextricably linked to the key principle

31

of beneficial use—all of the water must be beneficially used. *Power*, 21 Mont. at 529, 55 P. at 35 ("[W]hen the appropriator, or his successor in interest, abandons and ceases to use the water for such [a beneficial] purpose, the right ceases."); *McDonald*, 220 Mont. at 525, 722 P.2d at 601 ("There are two components to the Montana Constitutional guaranty: there must be an existing right to the use of water, and the use must be for a beneficial purpose."). Section 85-2-227(4), MCA, alters these cornerstone beneficial use principles in the substantive law, replacing them with a hybrid principle that requires only partial use of the water, in combination with a non-water use action, to create the presumption and to preserve the water right.

¶58 One of these non-water use actions listed in § 85-2-227(4)(b), MCA, is the construction of a "diversion or conveyance" structure. Thus, as the Water Court held and the Court affirms, the construction of a structure of sufficient size to merely *accommodate* the City's full water rights is sufficient to obtain the presumption (along with partial use of water), without actually using the full water right. Likewise, this is a change in the substantive law of abandonment and beneficial use.

¶59 This is incredibly significant to Skinner. Beyond the mere shifting of the burden of proof to him, the substantive law, and the evidence permitted thereunder, that Skinner formerly could have used to rebut the City's presumption and prove abandonment has now been altered dramatically, in the City's favor. Specifically, as we have repeatedly held throughout our entire history of water law, cited in the cases above, evidence of nonuse of water by a water right holder was "potent," "strong," or "clear" evidence of intent to

abandon. Now, under § 85-2-227(4), MCA, this same evidence will no longer be sufficient to prove an intent to abandon. As the City's briefing explains, and the Court holds, once a municipality satisfies the statute and the new presumption arises, "the burden of showing abandonment [is] on the challenger, *regardless of period of non-use*." (Emphasis added.) Consequently, under the statute, what we have repeatedly held to be the most critical evidence in a common law abandonment case—nonuse of the water—has, as a matter of law, been stripped of its evidentiary significance, thus essentially creating a *conclusive*, not rebuttable, presumption in the City's favor.

¶60 Such a conclusive presumption was clearly applied in the Water Court's decision that the Court today affirms. After first holding that the City had obtained the presumption under § 85-2-227(4), MCA, the Water Court ruled that Skinner's evidence of many years of nonuse simply did not apply because, as it explained, "the whole purpose of Section 85-2-227(4), MCA[,] is to presume nonabandonment in precisely those circumstances when intent to abandon would otherwise be presumed (e.g. based on a long period of nonuse)." It could not be any clearer that the very evidence this Court has held, for more than a century, was the best evidence of an intention to abandon a water right is simply no longer effective in cases involving municipalities. The Water Court used the statute to disallow Skinner's strongest evidence—the fact the City *could not put to beneficial use* large chunks of its water rights for significant periods of time. Indeed, the Water Court reached the incredible conclusion that Skinner had presented "*no evidence* that Helena intended to abandon 7.35 cfs of its water rights during the period from 1919 to 1948."

(Emphasis added.) Evidence that we have declared for over a century as "potent," "strong," and "clear" proof of abandonment under the common law has now been deemed to be "no evidence" whatsoever, as a matter of law. This is illustrated in the extreme by the Court's reversal of the Water Court's holding that the City abandoned the .6 CFS that it did not use for some 60 years. Skinner could not even prevail on his abandonment claim by showing six decades of nonuse!

¶61    These changes, which the Court explains is the codification of the Growing Communities Doctrine, go far beyond simple "procedural" changes. The statute "takes away or impairs vested rights acquired under existing laws or creates a new obligation, imposes a new duty, attaches a new disability in respect to transactions already passed, or gives a transaction a different legal effect from that which it had when it occurred." *Porter*, 275 Mont. at 185, 911 P.2d at 1150 (citation omitted). It will "produce a different legal result." *Porter*, 275 Mont. at 185, 911 P.2d at 1150. Property rights are protected by the Montana Constitution as a fundamental right. Mont. Const. art. II, § 3. Section 85-2-227(4), MCA, has dramatically eroded the pre-1973 common law under which Skinner's water rights were established, and also eroded the standing of his water rights against a municipality. His common law right to claim the use of water as a junior water user, upon proving abandonment of some water by a senior water user, has now been effectively impaired. This impacts his priority status, which we have declared to be a property right. All of the changes to Skinner's rights, discussed above, combine to cause a "substantive" impact.

¶62 I am not objecting to the Legislature's right to change the common law—it is entitled to change the common law when it wishes, and it has clearly done so. Nor am I saying that the statute violates the Constitution's protection of pre-1973 rights. That issue is not before us in this case. Further, I well understand the need to ensure that communities are able to protect sufficient supplies of water as they grow. However, that goal should not be obtained at the expense of the law, properly applied. Section 85-2-227(4), MCA, has clearly effectuated substantive changes in the law that have greatly impacted Skinner, and others who are situated similarly. Skinner's rights have been significantly devalued from the status they held under the common law. The statute effectuating these changes should not be whitewashed with a can of procedural Kalsomine. The changes rendered are clearly substantive, making the statute impermissibly retroactive.

¶63 I would reverse the Water Court's decision and remand for further proceedings for application of the common law principles of abandonment and beneficial use.

/S/ JIM RICE

Justice Laurie McKinnon and Justice Beth Baker join in the dissenting Opinion of Justice Rice.

/S/ LAURIE McKINNON
/S/ BETH BAKER