Chief Justice Mike McGrath delivered the Opinion of the Court.
***422 ¶1 Daniel Iverson and Wilks Ranch Montana, LTD (Wilks Ranch) appeal from a Montana Water Court order holding they failed to prove a long period of continuous nonuse and therefore failed to show Gene Klamert or his predecessors' presumed intent to abandon the water ***423 rights. We affirm.
¶2 We restate the issues on appeal as follows:
1. Whether the Water Court erred in concluding that Wilks Ranch and Iverson failed to establish a continuous period of nonuse.
2. Whether failure to assert water rights through the water commissioner is the equivalent of nonuse.
3. Whether the Water Court erred in not addressing the issue of partial abandonment.
4. Whether the Water Court erred in concluding the appropriate remedy for Wilks Ranch and Iverson would be to file a *382 dissatisfied water user complaint or pursue contempt proceedings.
PROCEDURAL AND FACTUAL BACKGROUND
¶3 Gene Klamert currently holds five decreed irrigation rights for diversion from Flatwillow Creek, all of which represent water rights originally decreed in Fraser v. Shields et al ., No. 764 (10th Jud. Dist. Petroleum Cty. Sept. 26, 1953) (hereinafter Fraser decree). The Flatwillow Creek basin, with its headwaters in the Big Snowy Mountains, is approximately forty-seven miles long, six miles wide, and was described in testimony as "an all or nothing creek" that is susceptible to drought because it lacks a large, high elevation catchment. All five of Klamert's claims share the same points of diversion and place of use and include two issue remarks indicating that fewer acres were irrigated than claimed. Below are the priority dates and flow rates for each claim:
Claim Priority Date Flow Rate 40B 9163-00 April 1, 1900 4.00 cfs 40B 9164-00 July 19, 1895 5.00 cfs 40B 9165-00 July 19, 1895 5.00 cfs 40B 9166-00 April 25, 1882 15.00 cfs 40B 9167-00 June 15, 1899 5.00 cfs
¶4 The above claims were filed by Klamert's predecessor in interest, the Nebraska Feeding Company (NFC). NFC sold the property in 1983 and over the course of the next decade or so the property passed between five different owners including: First Continental Corporation (FCC); Aetna Casualty and Surety Company of Illinois; Sunrise Farms, Inc.; Terry and Coral Langstraat; and finally, Klamert. The property was also leased by seven separate lessees between 1984 and 1998. In 1993, Terry Langstraat and Klamert leased the property with an ***424 option to buy and in 1994 they purchased the property under the name Sunrise Farms, Inc. (f/k/a Golden Eagle Farms, Inc.). Several years later, Langstraat and Klamert decided to split the property and, in 1998, Klamert purchased the property at issue here.
¶5 From 1980 to 2012, a water commissioner was appointed to distribute water in accordance with the Fraser decree. In addition to the water commissioner, who ensured priority and recorded use of water, the Flatwillow Improvement Association (FIA), an entity formed by the Fraser decree water users, was responsible for billing users. The water commissioner and the FIA maintained independent records documenting water use.
¶6 In 2012, Klamert filed motions to correct his water right claims and the United States Bureau of Land Management (BLM) and Daniel Iverson filed timely objections. Klamert's claims also received counterobjections from Ned Tranel and notices of intent to appear from Janna and Michael Taylor (later substituted by Twin Creeks Farm and Ranch, LLC) and Wilks Ranch.[1] Wilks Ranch later filed a motion to intervene on Klamert's claims, which the Water Court granted.
¶7 BLM's objections and the issue remarks, which did not identify abandonment as an issue, were resolved through a January 2013 stipulation between Klamert and BLM. The terms of the stipulation corrected the legal description for place of use and reduced the number of acres irrigated. Twin Creeks *383 Farm and Ranch, LLC, also adopted the terms of the stipulation. Following the stipulation, neither BLM nor Twin Creeks Farm and Ranch, LLC, participated in subsequent proceedings.
¶8 The Klamert property, located downstream from most Fraser decree water users on Flatwillow Creek, possesses one of the largest and the most senior right in the decree-40B 9166-00. Located upstream from the Klamert property is Iverson's ranch, a property that has been in the Iverson family for over seventy-five years. All of Iverson's water rights are junior to Klamert's claim in 40B 9166-00. Wilks Ranch also owns real property on Flatwillow Creek situated upstream from the Klamert property and has three water rights administered under the Fraser decree, all of which are junior to Klamert's claim in 40B 9166-00.
¶9 In August 2016, following the stipulation between Klamert and BLM, a five-day evidentiary hearing was conducted before a Water ***425 Master in Roundup, Montana. Wilks Ranch and Iverson's primary contention involved Klamert's alleged abandonment of his rights, particularly in claim 40B 9166-00. They asserted that the water commissioner and billing records establish neither Klamert nor his predecessors in interest used or called for water for a period of at least seventeen years, spanning from 1988 to 2004. Klamert challenged the veracity of the records and presented multiple witnesses who testified that they either irrigated or witnessed irrigation on the Klamert property during the alleged period of nonuse.
¶10 The Water Master's Report, issued on June 13, 2017, rejected the notion that Klamert's water rights had been abandoned, holding Wilks Ranch and Iverson failed to establish a continuous period of nonuse. The report also recommended acceptance of the stipulation between BLM and Klamert and removal of the issue remarks. Wilks Ranch and Iverson objected to the Water Master's Report, alleging factual and legal errors. The Water Court heard arguments on January 23, 2018, and issued its order adopting the Water Master's Report on June 6, 2018. The Water Court rejected all issues raised by Iverson and Wilks Ranch and concluded that the Water Master's recommendations were based on substantial credible evidence, the Water Master did not misapprehend the effect of the evidence, and, following review of the record, the Court was not left with a definite and firm conviction that a mistake had been made. Wilks Ranch and Iverson now appeal.
STANDARDS OF REVIEW
¶11 In cases involving a water master's report and a water court order adopting the water master's report, two standards of review apply: the standard the water judge applies to the water master's report and the standard this Court applies to the water court's opinion. City of Helena v. Cmty. of Rimini , 2017 MT 145, ¶ 11, 388 Mont. 1, 397 P.3d 1. The water court reviews the water master's findings of fact for clear error and the water master's conclusions of law for correctness. Skelton Ranch, Inc. v. Pondera Cnty. Canal & Reservoir Co. , 2014 MT 167, ¶ 25, 375 Mont. 327, 328 P.3d 644. The water court may adopt, modify, or reject the water master's report, in whole or in part, or may receive further evidence or recommit it with instructions. Skelton Ranch , ¶ 25.
¶12 This Court reviews the water court's order de novo, to determine whether it correctly applied the clear error standard of review to the water master's findings of fact and whether its conclusions of law were correct. Skelton Ranch , ¶ 26. Whether the standard of review was applied correctly is a question of law. City of Helena , ¶ 12. We review ***426 the water court's findings to determine whether they are clearly erroneous. City of Helena , ¶ 12. A factual finding is clearly erroneous if it is not supported by substantial evidence, if the trier of fact misapprehended the effect of the evidence, or if this Court is left with a definite and firm conviction that a mistake has been made. City of Helena , ¶ 13. Substantial evidence is evidence that a reasonable mind might accept as adequate to support a conclusion, even if the evidence is weak or conflicting. Skelton Ranch , ¶ 27. *384 DISCUSSION
¶13 1. Whether the Water Court erred in concluding that Wilks Ranch and Iverson failed to establish a continuous period of nonuse.
¶14 "[A] water right does not mean possession of a quantity of water, but its beneficial use ." 79 Ranch v. Pitsch , 204 Mont. 426, 433, 666 P.2d 215, 218 (1983). Consistent with this principle, Montana water law provides: "[w]hen the appropriator or his successor in interest abandons or ceases to use the water for its beneficial use, the water right ceases." 79 Ranch , 204 Mont. at 432, 666 P.2d at 218 ; § 85-2-404, MCA. A finding of abandonment requires both nonuse and intent to abandon. Heavirland v. State , 2013 MT 313, ¶ 23, 372 Mont. 300, 311 P.3d 813. Whether a water right has been abandoned is a question of fact that depends on the conduct, acts, and intent of the parties claiming the use of the water. Heavirland , ¶ 31.
¶15 The objector bears the initial burden of proving a long period of continuous nonuse of the claimed water right. Skelton Ranch , ¶ 53. While abandonment of a water right is a question of fact, ten successive years of nonuse raises, in effect, a rebuttable statutory presumption of intent to abandon. Section 85-2-404(2), MCA ; 79 Ranch , 204 Mont. at 434, 666 P.2d at 219. This statutory presumption applies only after all existing water rights have been adjudicated in accordance with Title 85, chapter 2, MCA. 79 Ranch , 204 Mont. at 434, 666 P.2d at 219. However, even if the existing water rights have not been adjudicated, and therefore do not fall under the purview of § 85-2-404(2), MCA, this Court has held that nine years of nonuse represents "very potent evidence" of intent to abandon. Smith v. Hope Mining Co., 18 Mont. 432, 438, 45 P. 632, 634 (1896). "[I]ntent to abandon 'need not be proved directly, but may be inferred from all the circumstances of the case.' " Heavirland , ¶ 31 (quoting Denver by Bd. of Water Comm'rs v. Snake River Water Dist ., 788 P.2d 772, 776 (Colo. 1990) ). If a continuous period of nonuse is established, the burden of proof then shifts to the claimant to produce specific evidence rebutting that presumed intent. 79 Ranch , 204 Mont. at 433, 666 P.2d at 218 ;
***427 Heavirland , ¶ 19. Mere expressions of hope or desire regarding future water use will be insufficient to overcome the presumption. 79 Ranch , 204 Mont. at 433, 666 P.2d at 218.
¶16 On appeal, Wilks Ranch and Iverson (hereinafter Objectors) contend that the Water Master was presented with substantial and credible evidence that no irrigation occurred between 1988 and 2004 and Klamert's failure to take the decreed water rights through the commissioner raised the rebuttable presumption of abandonment. Accordingly, they assert that the Water Master should have shifted the burden to Klamert to rebut the presumption and the Water Court erred when it held otherwise.
¶17 Objectors presented evidence indicating that between 1988 and 2004 the various owners and lessees of the Klamert property did not assert their water rights through the water commissioner. Specifically, Objectors pointed to water commissioner records showing no water use occurred on the Klamert property during the seventeen-year period. However, both the Water Master and the Water Court disagreed with Objectors' assertion that the records presumptively established a period of nonuse between 1988 and 2004. The Water Court reasoned that although the commissioner records were instructive, Klamert's evidence undermining the credibility of the records was also persuasive and thus, the Water Master's Report was based on substantial, credible evidence.
¶18 During the period of alleged nonuse there were three water commissioners appointed to enforce the terms of the Fraser decree-Bill Meserve, Bob Wiltse, and Jay Smith. The Water Master found that although the water commissioners generally recorded the same type of information including dates of use, water users, measurements of flow, etc., the records were notably inconsistent among commissioners. "Some commissioner records [were] clear and easy to decipher while others [were] more cryptic and chaotic." Some records were missing, unclear on what year was being addressed, and "often in disarray." Further, there were *385 no specific rules for water commissioners regarding record keeping or water measuring protocol and commissioners received little to no training. Bill Meserve, who was the water commissioner for twelve years of the alleged period of nonuse, had a reputation as a poor record keeper and water users sought outside assistance from the Montana Department of Natural Resources and Conservation to ensure the accuracy of his recording. Evidence and testimony established that some calls for water went unrecorded and water commissioners were occasionally unaware of the basis for the water rights they administered. Further, the Water ***428 Master found the commissioner records "reflect[ed] that very few, if any, calls for water were actually made."
¶19 FIA records for the alleged period of nonuse similarly demonstrate that neither Klamert nor his predecessors in interest were billed for water use between 1988 and 2004. The Water Master declined to interpret FIA records as substantial proof that no irrigation occurred and noted that although the FIA records were "generally more organized and consistent" than the commissioner records, they were not more credible. Moreover, testimony and other evidence established that it was often unclear who should receive FIA bills and which person would be responsible for payment. "In certain instances, there was confusion whether landowners or lessees should pay the bills, and there were issues with double billing."
¶20 The Water Master also heard evidence supporting Klamert's assertion that irrigation took place between 1988 and 2004. Sig Pugrud, who resided on the Klamert property from approximately 1989 to 1992, testified that she witnessed irrigation on the north, west, and southwest fields during the period she lived there. Toby Stahl testified that he irrigated on three different occasions between 1998 and 2003. John Hughes, Klamert's upstream neighbor, stated that there were no long periods of nonuse on the Klamert property and that he personally saw water running in a particular ditch between 1988 and 1992. The Water Master also noted that Brad Kinsey "succinctly and credibly" testified to water use that occurred in 1997. Moreover, the Water Master found that testimony from Tom Osborne, Klamert's expert witness, bolstered the credibility of lay witness testimony. And, to further undermine intent to abandon, Klamert offered evidence that ditches were regularly maintained during the alleged period of nonuse.
¶21 Throughout the five-day evidentiary hearing, the Water Master heard testimony from twenty lay witnesses, eight experts, and was presented with over one hundred exhibits. In sum, the record before the Water Master, and eventually the Water Court, was voluminous. Evidenced by the Water Master's comprehensive report, the Water Master carefully considered all evidence before issuing a reasoned analysis. While the Objectors point to FIA and commissioner records as evidence of nonuse, the Water Master found both were "plagued by completeness and credibility concerns." The water judge "may consider all relevant evidence in the determination and interpretation of existing water rights. Relevant evidence under this part may include admissible evidence arising before or after July 1, 1973." Section 85-2-227(2), MCA. While relevant, the commissioner and FIA records are not dispositive. The Water Court did not err when ***429 it held substantial, credible evidence supported the Water Master's findings that actual water use occurred between 1988 and 2004.
¶22 2. Whether failure to assert water rights through the water commissioner is the equivalent of nonuse.
¶23 The Objectors alternatively argue that even if water use did occur, water use outside the terms of the Fraser decree, or in their words "illegal use," cannot be used to defeat claims of abandonment. In other words, failure to assert water rights through the commissioner is the equivalent of nonuse. The Water Court rejected this reasoning and found that water use on the Klamert property was lawfully appropriated considering 40B 9166-00 is the most senior water right in the Fraser decree and water users therefore had authority to take water from Flatwillow Creek any time water was available. This Court agrees with the Water Court's analysis.
*386 ¶24 To support their position, Objectors rely on Warren v. Senecal , 71 Mont. 210, 228 P. 71 (1924).[2] In Warren , this Court held that a person cannot obtain a valid water right through trespass and that water appropriation "necessarily implies rightful diversion by lawful means." Warren , 71 Mont. at 220, 228 P. at 75. Objectors interpret this holding to mean that the "diversion and appropriation of water must always be legal to ripen into, and to maintain, the water right." Even so, nowhere in Warren does this Court equate failure to follow water commissioner protocol with nonuse or "illegal use." Such a reading would unduly extend the Warren holding and would be inconsistent with existing abandonment jurisprudence.
¶25 Objectors also cite to S Bar B Ranch Co. v. Gordon, Case 40J-4 (MT Water Ct. June 6, 2016) to support their contention that the Water Court's holding violates the equitable clean hands doctrine. The doctrine is based on a "fundamental principle of equitable jurisprudence that one who seeks equity must do equity." Kauffman-Harmon v. Kauffman , 2001 MT 238, ¶ 13, 307 Mont. 45, 36 P.3d 408 ; § 1-3-208, MCA. "Accordingly, this Court will not aid a party whose claim had its inception in the party's wrongdoing, whether the victim of the wrongdoing is the other party or a third party." Kauffman-Harmon , ¶ 19. In S Bar B Ranch Co ., the Water Court addressed the clean hands doctrine but found that it did not apply. S Bar B Ranch Co ., Case 40J-4 (MT Water Ct. June 6, 2016). We find the doctrine ***430 similarly inapplicable here. Although the Water Master recognized that Klamert and his predecessors did not appear in the water commissioner and FIA records between 1988 and 2004, the Water Master also noted that the records were fraught with error and, for many of those years, the landowners and lessees paid dues, attended meetings, and Klamert even served on the FIA Board. The Water Master further acknowledged that reporting to the water commissioner was inconsistent among other Flatwillow Creek water users. In light of these circumstances, Objectors fail to establish that Klamert attempted to "take advantage of [his] own wrong." Section 1-3-208, MCA.
¶26 3. Whether the Water Court erred in not addressing the issue of partial abandonment.
¶27 Objectors argue the Water Master should have entered findings specific to the alleged abandonment of each individual claim and that the Water Court erred in declining to address the issue of partial abandonment. "[A] water judge may determine all or part of an existing water right to be abandoned based on a consideration of all admissible evidence that is relevant, including, without limitation, evidence relating to acts or intent occurring in whole or in part after July 1, 1973." Section 85-2-227(3), MCA (emphasis added). Objectors contend that partial abandonment should have been considered: (1) at the section nine point of diversion beyond Headquarters Road; (2) for all acres under the section sixteen point of diversion and place of use; and (3) for all acres under the section two point of diversion and place of use. The Water Master broadly contemplated use at each of these points of diversion and places of use and found the evidence weighed against a continuous period of nonuse. As the Water Court pointed out, Objectors offered "little, if any, evidence addressing individual claims, save for general references to claim 40B 9166-00 as the most senior right in the Fraser Decree." Accordingly, the Water Master's Report reflects the evidence Objectors presented at the hearing. It is apparent from the report that the Water Master weighed the relevant evidence before concluding no long period of continuous nonuse occurred for any of Klamert's claims. Failure to delineate specific findings for each individual claim did not amount to clear error.
¶28 4. Whether the Water Court erred in concluding the appropriate remedy for Wilks Ranch and Iverson would be to file a dissatisfied water user complaint or pursue contempt proceedings.
¶29 The Water Court found that if Objectors took issue with Klamert's failure to *387 report diversions to the water commissioner the proper remedy would be a dissatisfied water user complaint pursuant ***431 to § 85-5-301, MCA, or contempt proceedings under § 85-5-406, MCA. Objectors assert that a claim under § 85-5-301, MCA, is unavailable to them because they lack standing. Section 85-5-301, MCA, provides:
A person owning or using any of the waters of the stream or ditch or extension of the ditch who is dissatisfied with the method of distribution of the waters of the stream or ditch by the water commissioner or water commissioners and who claims to be entitled to more water than the person is receiving or to a right prior to that allowed the person by the water commissioner or water commissioners may file a written complaint, duly verified, setting forth the facts of the claim.
In Luppold v. Lewis , 172 Mont. 280, 285, 563 P.2d 538, 541 (1977), this Court interpreted the statutory language:
A careful reading indicates there are two means to achieve standing: First the user is dissatisfied with the method of distribution by the water commissioner and claims to be entitled to more water than he is receiving, or second, the user is dissatisfied with the method of distribution by the water commissioner and is entitled to a right prior to that allowed him by such water commissioner.
(Emphasis added). Objectors' circumstances place them outside the scope of either approach considering neither Iverson nor Wilks Ranch felt entitled to more rights or water than they were receiving. Indeed, Objectors claim they were receiving more water than anticipated under the Fraser decree due to Klamert's alleged nonuse. In any event, alternative measures for enforcement of the Fraser decree and proper delivery by a water commissioner were not questions before the Water Master or Water Court. Rather, the only issue raised was whether Klamert's water rights had been abandoned. The Water Master and Water Court squarely addressed this issue and were under no obligation to discuss alternative remedies.
CONCLUSION
¶30 For the aforementioned reasons, the Water Court's adoption of the Water Master's Report did not amount to reversible error.
¶31 Affirmed.
We Concur:
DIRK M. SANDEFUR, J.
BETH BAKER, J.
INGRID GUSTAFSON, J.
JIM RICE, J.

Ned Tranel eventually withdrew his counterobjections to Klamert's claims during discovery.

Objectors also cite to a Colorado case, Grand Valley Water Users Ass'n v. Busk-Ivanhoe , Inc., 386 P.3d 452 (Colo. 2016). Because it is not binding authority and we find the case factually distinguishable, we decline to address it in further detail.