FILED

01/25/2022

Bowen Greenwood
CLERK OF THE SUPREME COURT
STATE OF MONTANA

Case Number: DA 21-0276

DA 21-0276

IN THE SUPREME COURT OF THE STATE OF MONTANA

2022 MT 19

TWIN CREEKS FARM & RANCH, LLC,

      Claimant and Appellant,

    v.

PETROLIA IRRIGATION DISTRICT; TWIN CREEKS
FARM & RANCH, LLC; DANIEL W. IVERSON,

      Objectors and Appellees,

DANIEL W. IVERSON; WILKS RANCH MONTANA, LTD,

      Notice of Intent to Appear.

APPEAL FROM:    Montana Water Court, Case No. 40B-0004-P-2012
                Honorable Stephen R. Brown, Associate Water Judge

COUNSEL OF RECORD:

      For Appellant:

      John E. Bloomquist, Bloomquist Law Firm, P.C., Helena, Montana

      For Appellee Petrolia Irrigation District:

      John R. Christensen, Christensen Fulton & Filz, PLLC,
      Billings, Montana

                      Submitted on Briefs:  December 8, 2021
                                Decided:  January 25, 2022

Filed:

                                    _____
                                         Clerk

Chief Justice Mike McGrath delivered the Opinion of the Court.

¶1 Twin Creeks Farm & Ranch appeals a May 6, 2021 order by the Water Court that adjudicated the priority dates for certain of its water rights in Basin 40B.

¶2 We restate the issues on appeal as follows:

*Issue One: Did the Water Court err in concluding that the water rights to much of Twin Creeks' irrigated acreage had been abandoned between the initial claimed priority date of 1903 and later irrigation development around 1968?*

*Issue Two: Did the Water Court err in granting Twin Creeks an implied claim with a 1968 priority date rather than tying the later irrigated acreage to the original 1903 claim?*

¶3 We affirm.

## FACTUAL AND PROCEDURAL BACKGROUND

¶4 Marie and Samuel Smith settled in the area near the confluence of Flatwillow Creek and Box Elder Creek, in what is now Petroleum County, Montana, around the turn of the 20th Century. Flatwillow Creek drains from the Big Snowy Mountains and wanders eastward to feed the Musselshell River. Box Elder Creek meets it from the north some seven or eight miles before its terminus.

¶5 At the time, the Desert Land Act, an amendment to the Homestead Act of 1862, facilitated westward Americans in patenting the vast arid lands that had become the federal estate during the 19th Century.[1] Instead of the residence on the property that the Homestead Act required, the Desert Land Act operated through proof of effort and intent

---

[1] In fact, while the 1976 Federal Lands Policy and Management Act repealed the Homestead Act and largely ended the era of disposal of federal land, the Desert Land Act remains in place—although opportunities to irrigate and patent eligible dry land today are onerous and scarce.

to irrigate the claimed acreage. The property in this case derives from several Desert Land Act patents the Smiths filed and acquired between 1901 and 1905. Their applications described plans to grow hay on sections of land around the Flatwillow-Box Elder confluence and to dig irrigation ditches that would run eastward from a point on Flatwillow Creek to water fields above its south bank. On one 1901 deposition filing to prove one of the patents, Samuel Smith wrote that they had gotten 100 acres under irrigation.

¶6 Under Montana's prior-appropriation system of water rights, the Smiths established rights to their water based on the amount put to beneficial use and the date they started using it. When water is scarce, water users with later priority dates receive flows to satisfy their water rights only after earlier appropriators are satisfied first.[2] Beginning in 1885, territorial and then state law permitted water users to post notices of initiated appropriations that would solidify their priority dates, even if they had not yet completed all the necessary diversion. *See Danreuther Ranches v. Farmers Coop. Canal Co.*, 2017 MT 241, ¶¶ 32, 41, 389 Mont. 15, 403 P.3d 332.[3] Thus, to secure priority for the tract at issue in this case, Marie Smith filed a notice of appropriation in 1904. She claimed a flow of 7.5 cubic feet per second (cfs) with a priority date in 1903.[4]

---

[2] "As between appropriators the one first in time is first in right." Section 1885, MCA (1895); § 89-807, RCM (1947); § 85-2-401, MCA (2019).

[3] *See* §§ 1886-1887, MCA (1895) (requiring the appropriator to "proceed to prosecute the excavation or construction of the work" within 40 days, with "reasonable diligence to completion").

[4] Two other notices, filed by Samuel Smith, also overlap with and describe this place of use, but the filed claim at issue here derives from citation only to Marie's original notice.

¶7     Water rights in Montana also follow a "use-it-or-lose-it" principle. *79 Ranch v. Pitsch*, 204 Mont. 426, 431, 666 P.2d 215, 217 (1983).[5] Thus, the extent to which Marie Smith's claimed water rights exist today depends on the amount used, and the continuity of that use, over the intervening nearly 120 years. Appellant Twin Creeks Farm & Ranch now owns the claim and the land at the Flatwillow-Box Elder confluence, and adjudicating its water rights there depends on unraveling the property's history.

¶8     The Smiths transferred their property to Ernest Hanson, likely sometime in the 1930s. Hanson ranched it, then leased it for many years, then sold it to his grandsons in 1965. Hanson's grandsons were the Damschen brothers. Kenny Damschen died in the 1970s, and Robert Damschen still had the land in 1982 when he filed a statement of claim for 7.5 cfs, referencing Marie Smith's notice and describing a 210-acre place of use. By that time, no one questions that Damschen was irrigating the whole thing.

¶9     The reason Damschen filed a new claim statement was because by then Montana's water law had received an overhaul. We now have a Water Court systematically working to adjudicate rights in a series of numbered basins throughout the state. *See* Mont. Const. art. IX, § 3; Title 85, chapter 2, part 2, MCA. Water Court judges work to allocate the flow in each basin by discerning who has rights to what flow for what purpose based on various priority dates. After the new system was established, water rights holders needed to freshly

---

[5] "The appropriation must be for some useful or beneficial purpose, and when the appropriator or his successor in interest abandons and ceases to use the water for such purpose[,] the right ceases." Section 1881, MCA (1895); § 89-802, RCM (1947); *see also* § 85-2-404, MCA (2019).

file their claims in order to be part of the basin-wide adjudication and avoid forfeiting their rights. 1979 Mont. Laws ch. 697, § 11; *In re Water Rights Order* (1979), 36 St. Rep. 1228.

¶10   The Damschen land is in Basin 40B, and the claim at issue here is Claim No. 40B 109104-00, the "104 claim." Damschen sold the property with this claim to Michael and Janna Taylor in 1993, and they sold it to Twin Creeks Farm & Ranch in 2015. The Taylors and later Twin Creeks appeared for the Water Court's adjudication of Basin 40B to try to make sure, among other things, that the 104 claim was settled as fully perfected with the 1903 priority date established by Marie Smith.

¶11   One thing Twin Creeks wanted to resolve was an "issue remark" that the Department of Natural Resources & Conservation (DNRC) placed on this claim in 2005. Such remarks result from DNRC efforts to survey the accuracy of claims prior to the Water Court adjudicating a basin. When DNRC staff reviewed the 104 claim, they noted that a 1971 Water Resource Survey described only 151 acres under irrigation that year. Twin Creeks wanted to resolve the discrepancy to ensure that its claim continued to reflect 210 acres' worth of water use.

¶12   Upon request in 2013, then-DNRC water resource specialist Teresa Olsen prepared a report attempting to resolve the issue remark. Her report relied on the 1971 Water Resource Survey materials, a series of aerial photographs, the Smiths' patent files, and other evidence. Her conclusion was that she saw insufficient grounds to remove the issue remark.

¶13   Other parties also raised objections before the Water Court regarding the 104 claim. Upstream on Flatwillow Creek sits Petrolia Lake, a reservoir that stores water distributed

5

by the Petrolia Irrigation District (PID). PID holds water rights with a priority date of 1950—junior to the 1903 rights claimed by Twin Creeks. PID objected to the filed 104 claim on the grounds that 210 acres, or even 151 acres, were not actually perfected for the 1903 priority date. PID argued that prior to the Damschen brothers expanding irrigation on the property in the late 1960s, water was diverted for no more than 15 acres in a field at the west end of the claimed place-of-use. PID contended that only 15 acres' worth of flow should get the 1903 priority date.

¶14 The Water Court held an evidentiary hearing to address the objections on the 104 claim, as well as other nearby claims that raised similar issues. At the hearing, several eyewitnesses testified on behalf of PID about their memory of the property's development. PID's witnesses recalled only the 15-acre field being irrigated prior to the Damschens' ownership. These witnesses included two women who were daughters of the man who leased the property from 1950 to 1965, one man from the area who visited the property frequently and married one of the daughters, and another man who had worked on the property during those years. They all said that at the time, there was only a diversion channel to bring water to the 15-acre field on the west side of this property and that none of the area further east was under irrigation.

¶15 Twin Creeks presented the testimony of another man who grew up in the area, Terry Sandman. Sandman remembered hay growing in the fields on the eastern side of the 104 claim sometime between 1948 and 1950, but he could not recall exactly the size and extent of the irrigation works. His testimony contradicted some of that from PID's witnesses. He

surmised from his recollections that greater than 15 acres were reached by irrigation ditches and that road access existed beyond what PID's witnesses described.

¶16    Also in evidence at the Water Court hearing were aerial photos showing the 104 claim in 1948, 1954, 1968, and 1979. These had been some of the materials Teresa Olsen relied upon for her 2013 report, and she testified at the hearing as well. To analyze the aerial photos, Twin Creeks presented the testimony of an expert witness, Lee Yelin. Yelin interpreted the photos to show irrigation over the entire area in 1948 and 1954; he traced red lines throughout the 1948 image where he said that conveyance ditches were discernable from shadows and other faint features. Yelin also referenced the hand-drawn maps that Samuel and Marie Smith had prepared for their patent applications, trying to corroborate that the ditches sketched on those maps aligned with features he identified in the later aerial photos.

¶17    The Water Court issued a closing order on Twin Creeks' claims in 2018. Under Montana statutes, Water Court rules, and this Court's precedent, a properly filed water right claim serves as prima facie evidence of its contents; unless an objector can overcome the presumption that the claim is valid, it stands as filed. Section 85-2-227, MCA; W. R. Adj. R. 19; *Weinheimer Ranch, Inc. v. Popisil*, 2013 MT 87, ¶ 27, 369 Mont. 419, 299 P.3d 327. The Water Court's 2018 order held that PID had not overcome the presumed validity of Twin Creeks' claim for 210 acres of perfected flow rights, and it thus granted Twin Creeks all its requested water rights with the 1903 priority date.

¶18    PID appealed that decision to this Court. PID pointed out that the Water Court had misapprehended the evidence from Teresa Olsen, undercutting the reasoning for its order.

7

The Water Court had treated Olsen's testimony as confirming that 151 acres appeared irrigated in the 1948 and 1954 photographs, when in fact she had stated that her assessment included no such finding. Upon review, we concluded that PID had met its burden to challenge the facial validity of Twin Creeks' 104 claim. And we reversed the Water Court's 2018 order with instructions on remand to better determine the extent of the acreage irrigated before 1968, to what extent any earlier irrigation may have been abandoned, and what priority date should belong to the expanded water use that followed the Damschen brothers' ownership. *See Twin Creeks Farm & Ranch, LLC v. Petrolia Irrigation Dist.*, 2020 MT 80, ¶¶ 42-43, 339 Mont. 431, 461 P.3d 91.

¶19 On remand, the parties briefed the Water Court about all this evidence again and did not enter more evidence. The Water Court issued another order on May 6, 2021. This time, the Water Court found that even if irrigation extended beyond the 15-acre field in the years immediately following the Smiths' patents, nothing beyond that field was irrigated between at least 1948 and the Damschen brothers' expansion around 1968. The lack of use for at least 20 years creates a presumption of abandonment. Montana law presumes intent to abandon after 10 successive years of non-use. Section 85-2-404(2), MCA; *Klamert v. Iverson*, 2019 MT 110, ¶ 15, 395 Mont. 420, 443 P.3d 379. The Water Court found that Twin Creeks failed to present sufficient evidence to rebut that presumption. The Water Court thus issued for the 104 claim, with its 1903 priority date, only flow to account for 15 acres of use.[6] For the remaining 195 acres, the Water Court ordered an implied

---

[6] The Water Court determined that the patent records and hand-drawn maps were insufficient to establish historical irrigation on the 64 easternmost acres of the place-of-use but that the

8

claim right with a 1968 priority date, beginning when the evidence showed water put to use there by the Damschen brothers.

¶20 Now, Twin Creeks appeals. They ask us to reverse the findings from the Water Court's order on remand. Twin Creeks argues that the evidence it presented made clear that greater acreage was irrigated prior to 1968 and that consequently the Water Court erred in finding abandonment. Alternatively, Twin Creeks argues that even if all that acreage was abandoned prior to 1968, flow for the expanded use at that time should still be tied to the 1903 priority date.

**STANDARD OF REVIEW**

¶21 We review the Water Court's findings of fact to determine whether they are clearly erroneous. *Sunset Irrigation Dist. v. United States (Fish & Wildlife Serv.)*, 2021 MT 25, ¶ 8, 403 Mont. 123, 480 P.3d 214 (citing *Skelton Ranch, Inc. v. Pondera Cty. Canal & Reservoir Co.*, 2014 MT 167, ¶ 26, 375 Mont. 327, 328 P.3d 644). We will hold factual findings clearly erroneous if they are not supported by substantial evidence, if the court below misapprehended the effect of the evidence, or if, upon review, we are left with the definite and firm conviction that a mistake has been made. *Skelton Ranch*, ¶ 27. "Substantial evidence is evidence that a reasonable mind might accept as adequate to support a conclusion, even if the evidence is weak or conflicting." *Curry v. Pondera Cty.*

---

remaining 146 acres may have once been irrigated. The closing paragraphs of the Water Court's order cite a figure of 148 acres; this appears to be a typographical error and likely should have read 146 (210-64=146). The difference is immaterial because the Water Court found all but 15 acres of that historic use abandoned. DNRC has established a standard flow rate of 17 gallons per minute per acre. This equates to 0.57 cfs for the retained 15 acres and 6.93 cfs for the remaining 195 acres, as the Water Court divided the rights in its order.

9

*Canal & Reservoir Co.*, 2016 MT 77, ¶ 20, 383 Mont. 93, 37 P.3d 440. We review the

Water Court's conclusions of law for correctness. *Sunset Irrigation*, ¶ 8.

## DISCUSSION

¶22 *Issue One: Did the Water Court err in concluding that the water rights to much of Twin Creeks' irrigated acreage had been abandoned between the initial claimed priority date of 1903 and later irrigation development around 1968?*

¶23 Twin Creeks' primary assertion on appeal is that the Water Court misapprehended the evidence from the aerial photos and its expert witness. According to Twin Creeks, that evidence plainly demonstrates extensive irrigation prior to 1968 and we should clearly see the Water Court's error. Twin Creeks' argument covers three subjects: the acreage irrigated by the Smiths, as evident in their patent records; the acreage irrigated in 1948 and 1954, as evident in the aerial photos; and what the 1971 Water Resource Survey evidence says about the 1948 and 1954 photos.

¶24 We need not dwell on the first subject, the evidence from the Smiths' patents. As the Water Court's order noted, even though the Smiths developed some broader irrigation early on—the patent evidence indicating perhaps 146 acres—the dispositive question is what happened between 1948 and 1968. If only 15 acres were irrigated during that length of time, this can create a rebuttable presumption the rest was abandoned. *See* 85-2-404(2), MCA; *Twin Creeks*, ¶ 42; *Skelton Ranch*, ¶¶ 52-54. Thus, to whatever extent Samuel and Marie Smith's hand-drawn maps might depict ditches reaching eastward across the property, it matters more whether any such ditches remained in use decades later.

¶25 For the second subject, the essential question is whether the evidence from the aerial photos clearly contradicts and outweighs the eyewitness testimony regarding the lack of

10

irrigation from 1948 to 1968. According to Twin Creeks' expert Lee Yelin, the 1948 and 1954 photographs depict extensive active irrigation works. However, upon review of these photographs and Yelin's testimony, we conclude that the Water Court carefully noted and weighed the evidence to reach its decision, and we find no error.

¶26 We already expressed some skepticism of Yelin's interpretation when we issued our first order in this case. "Yelin's testimony, standing alone," we said, "is not such that 'a reasonable mind might accept as adequate'" for the Water Court's original determination approving Twin Creeks' claim as filed. *Twin Creeks*, ¶ 41 (citing *Skelton Ranch*, ¶ 27). And the Water Court had to weigh that testimony against substantial conflicting evidence showing abandonment. PID's several eyewitnesses testified to the long-time absence of irrigation beyond the 15-acre field. Teresa Olsen, as we clarified before, had reviewed and affirmed survey results saying that the easternmost acreage was not irrigated in 1971. Furthermore, her testimony at the Water Court's hearing included her observation that the 1948 and 1954 photos did not appear to show irrigation across the asserted place-of-use.

¶27 Twin Creeks asserts that the aerial photos "graphically dispel" PID's evidence. But even when we view them while considering Yelin's testimony about certain similarities to the Smiths' hand-drawn maps and his caveats about shadows and seasons, the myriad irrigation-ditch lines Yelin traced over the images are not so convincing as to leave this Court with the firm conviction that the Water Court made a mistake.

¶28 Twin Creeks also asserts that Sandman's testimony reinforces its stance on 1948 and 1954 irrigation. First, Twin Creeks points out areas where Sandman's testimony was allegedly more accurate than that of PID's witnesses regarding other nearby water rights.

11

Second, Twin Creeks argues that a road only Sandman described can be "easily seen" in the 1948 and 1954 photographs, which should temper the credence given to PID's witnesses' claims. What this Court easily sees, however, is the stark appearance of a road in the 1968 photo that is *not* present in the earlier photos. And in any case, this argument by Twin Creeks aims at inflating the credibility of its witness and deflating that of PID's witnesses; credibility determinations are the purview of the trial court and are not a sufficient basis for reversal here. *Cameron v. Cameron*, 179 Mont. 219, 228, 587 P.2d 939, 944 (1978); *Twin Creeks*, ¶ 12 (citing *Only a Mile, LLP v. State*, 2010 MT 99, ¶ 10, 356 Mont. 213, 233 P.3d 320).

¶29 Finally, Twin Creeks turns to its third subject, the Water Resource Survey and the Water Court's supposed misapprehension of this evidence. At the Water Court hearing, Teresa Olsen testified at length about the survey and claim examination process. While conducting field investigations and interviews to document water use in Petroleum County in 1971, the surveyor used the 1954 and 1968 aerial photos as references for the claimed places of use. The surveyor's paperwork documents 151 acres under irrigation for the 104 claim, and the surveyor included notes on top of the aerial photos, using them to map the results. When a DNRC claims examiner reviewed the claim in 2005, she referenced those images in the "map" column of a table summarizing the examined acres. According to Twin Creeks, this process amounts to the surveyor and the claims examiner confirming that 151 acres were irrigated *in 1954*.

¶30 The Water Court, however, noted that the surveyor "did not actually analyze" the photographs and instead used them "as a canvas" on which to display the results of the

1971 survey documenting irrigated acreage *in 1971*. Twin Creeks calls this statement a misapprehension of the evidence, but it is not. Teresa Olsen's testimony made clear that the survey materials do not constitute evidence of irrigation prior to when the survey occurred in 1971. For example, when discussing one of the other claims at issue, Twin Creeks' attorney asked Olsen directly to confirm if an issue remark because of a water resource survey is "related to something in the field notes, not necessarily something in reviewing the maps or the aerial photos." "Correct," she responded, confirming that it was the surveyor's 1971 field work, not the maps and photos, that led to the acreage listed. Later, when Olsen said that the surveyor's remarks were "noted on the 1954 aerial photo," the attorney asked directly whether that meant the claims examiner was interpreting the photo. "No," Olsen said, again making clear that the photo was not being used as evidence for the irrigation but was rather, like the Water Court said, a "canvas" on which to geographically orient the results. We conclude that the Water Court appropriately considered the available evidence, and we find no error.

¶31 *Issue Two: Did the Water Court err in granting Twin Creeks an implied claim with a 1968 priority date rather than tying the later irrigated acreage to the original 1903 claim?*

¶32 Twin Creeks' alternative argument contends that even if all but 15 acres were abandoned, the later expansion by the Damschen brothers can still attach to the 104 claim's 1903 priority date. To support this theory, Twin Creeks cites a "no-injury" rule that applied to water rights prior to 1973. This former law provided that a water appropriator was free to "change the place of diversion" or to "extend the ditch . . . by which the diversion is made, to any place other than where the first use was made," as long as the alteration did

13

not injure other water users. Section 89-803, RCM (1947). Water use altered under this "no-injury" rule retained its original priority date. Twin Creeks argues that the Water Court should not have treated the Damschen expansion as a new, implied claim and instead should simply have treated it as a "no-injury" change to the preexisting right with the 1903 priority date.

¶33    But Twin Creeks misapplies this law. Taking appropriated water and changing its place or manner of use is entirely different from *appropriating more water*. The facts established by the Water Court here show that prior to 1968, all but 15 acres' worth of flow under the 1903 claim had been abandoned. Then, the Damschen brothers began to irrigate more acreage in addition to the 15-acre field. They did not "extend the ditch" to move the water from the 15 acres to elsewhere. Instead, they maintained that irrigation while applying more water where it was previously absent. It is impossible to apply a rule about "change of use" to a shift from *non-use* to *new use*. The additional water use initiated in 1968 must be construed as a new appropriation.

¶34    This has long been the rule applied to abandoned water rights and is necessary to carry out the "use-it-or-lose-it" principle. If someone has claimed water but abandons it to remain in the stream, that water returns to the public domain and is subject to appropriation by others along the stream. *Tucker v. Jones*, 8 Mont. 225, 229, 19 P. 571, 572 (1888). "[W]here [a water user] abandons one right . . . rights to the appropriation abandoned are lost, and reassertion of right to the abandonment appropriation . . . merely amounts to a new appropriation." *O'Shea v. Doty*, 68 Mont. 316, 321, 218 P. 658, 659 (1923). We have also stated clearly that "[w]here use of water is abandoned and resumed, use vests from

14

date of resumption." *Galiger v. McNulty*, 80 Mont. 339, 358, 260 P. 401, 406 (1927). These rules clearly apply to Twin Creeks' rights here, and the Water Court was correct to establish an implied claim dating to the new appropriation begun in 1968.

## CONCLUSION

¶35 The May 6, 2021 order by the Water Court is affirmed.


/S/ MIKE McGRATH


We Concur:

/S/ JAMES JEREMIAH SHEA
/S/ INGRID GUSTAFSON
/S/ BETH BAKER
/S/ JIM RICE